696 F.2d 692
 51 P.U.R.4th 463
 CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF
CHICAGO, et al., Plaintiffs/Appellees,
v.
The STATE OF WASHINGTON et al., Defendants/Appellants,
The Don't Bankrupt Washington Committee, Intervenor/Appellant.
UNITED STATES of America, Plaintiff/Appellee,
v.
The STATE OF WASHINGTON, et al., Defendants/Appellants,
The Don't Bankrupt Washington Committee, Intervenor/Appellant.
 No. CA 82-3404.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 10, 1982.
Decided Jan. 11, 1983.
 
 Jeffrey D. Goltz, Asst. Atty. Gen., Olympia, Wash., for defendants-appellants.
 William R. Squires, III, Davies, Wright, Todd, Riese & Jones, Seattle, Wash., argued, Franklin P. Auwarter, Mayer, Brown, Platt, Chicago, Ill., Richard K. Willard, Washington, D.C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, ANDERSON and CANBY, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 This case involves a challenge to the constitutionality of the Washington State Energy Financing Voter Approval Act, 1981 Wash.Laws (2d Ex.Sess.) ch. 6 ("Initiative 394"), as applied to three nuclear power plants currently under construction. The initial challenge was brought by three banks[1] serving as trustees for holders of bonds previously issued to finance the construction of these projects. The Don't Bankrupt Washington Committee ("Committee"), the original proponent of Initiative 394, was permitted to intervene. The United States then filed suit challenging the Initiative on behalf of the Bonneville Power Administration ("BPA"). The Committee was also permitted to intervene in that action and the two cases were consolidated.
 
 
 2
 Plaintiffs argued that Initiative 394 violated various provisions of the federal and state constitutions. The district court held that the Initiative unconstitutionally impaired existing contractual obligations to finance and complete three nuclear power plants under construction. U.S. Const. Art. I, Sec. 10. It did not reach the additional contentions presented. We affirm.
 
 BACKGROUND
 
 3
 BPA is a federal agency charged with marketing the power produced from federal hydroelectric projects in the Columbia River Basin to 147 customers in the Pacific Northwest. In the 1960's, BPA was faced with rapidly increasing demand for power and concluded that it would be unable to meet the future needs of its customers from existing facilities. As a result, BPA embarked upon a program under which certain of its customers were to build and operate the additional power plants needed to meet the anticipated demand. One segment of the program provided for BPA's "preference customers" (public utilities and cooperatives) to construct power projects that would be integrated into BPA's system without BPA's owning or operating the projects.
 
 
 4
 The Washington Public Power Supply System ("WPPSS") is the builder of three nuclear power plants to be operated by it as part of the BPA program. WPPSS is a municipal corporation of the State of Washington known as a "joint operating agency."[2] It is comprised of 19 public utility districts and 4 municipalities, all of which are also political subdivisions of the State. During the early 1970's WPPSS entered various agreements to enable it to build and operate the plants. Those agreements and the provisions of state law in existence at the time they were executed contain the obligations of contract allegedly impaired by Initiative 394. The agreements fall into three categories.
 
 
 5
 The first category consists of project agreements between BPA and WPPSS governing the construction and operation of each of the three plants.[3] The project agreements allow BPA to oversee certain aspects of construction including budgets and termination. BPA is authorized to disapprove "significant action" taken by WPPSS if BPA concludes that the action is inconsistent with "Prudent Utility Practice."[4] If WPPSS and BPA are unable to agree on the proposed action, the matter is referred to an independent "project consultant." The project consultant is authorized to resolve the dispute in accordance with the Prudent Utility Practice standard. There is little doubt that a decision not to finance the projects through to completion would be a "significant action" subject to disapproval if it did not meet the Prudent Utility Practice standard. In addition, the project agreements specifically obligate WPPSS to "use its best efforts to issue and sell bonds to finance the costs" of construction of each plant.
 
 
 6
 The second category of agreement entered by WPPSS consists of "Net Billing Agreements" between WPPSS, BPA and other "participants," who are BPA customers. Like the project agreements, the Net Billing Agreements require WPPSS to construct and operate the plants in accordance with Prudent Utility Practice. They also make each participant liable for a share of the construction and financing costs of the project equal to that participant's share of anticipated power output. Under the agreements, the participants assign their share of anticipated output to BPA in return for credit for an equal amount of power on their wholesale bill from BPA. BPA in turn assumes each participant's obligation to pay its share of the construction and financing costs of the project. The result of the Net Billing Agreements, then, is that BPA receives essentially all the power[5] to be produced by the three plants, and undertakes to pay the construction and financing costs of the projects whether or not any power ultimately is produced by the plants. Those costs BPA would presumably pass on to its ratepayers throughout the Northwest. This obligation of BPA to pay the costs of constructing the plants regardless of output makes the protections of the project agreements extremely important to BPA. The project agreements enable BPA to prevent a termination of construction by WPPSS unless that termination is consistent with Prudent Utility Practice.
 
 
 7
 The third category of agreement entered by WPPSS consists of promises to bond purchasers, made in the form of bond resolutions and the state statutes giving them effect. WPPSS issued revenue bonds, payable solely from the income derived by WPPSS from its ownership and operation of the power plants.[6] The bond resolutions assured bondholders that WPPSS was "duly authorized under all applicable laws to create and issue the bonds and to adopt [the resolutions]." The authorizing section of the resolutions permitted the issuance of future bonds "in such amounts and from time to time as may be required to pay the costs of construction." The resolutions contain covenants by WPPSS that it would "take all lawful measures required to issue and sell" the additional bonds required to complete the project. WPPSS also agreed to "use its best efforts to issue and sell Bonds to finance the costs of the project and the completion thereof." It covenanted that it would "proceed with all reasonable diligence to and will construct to completion the project and complete such construction at the earliest practical time."
 
 
 8
 WPPSS' promises to use best efforts to sell bonds and to proceed with diligence to completion are important to the bondholders, of course, because the bonds are payable from revenues produced by operation of the plants. It is true that the bondholders are also protected by BPA's obligation under the Net Billing Agreements to pay the costs of construction including its financing, but that fact does not render the promises of completion unimportant to the bondholders. Sale of power is still an important source of repayment of the bonds. The bond resolutions themselves recognized that operation of each project is "essential to the payment and security of the Bonds."
 
 INITIATIVE 394
 
 9
 Initiative 394 was enacted at the Washington general election of November 3, 1981, in response to cost overruns and construction delays at five[7] nuclear power plants then under simultaneous construction by WPPSS.[8] Initiative 394 applies only to future projects and those projects still under construction as of July 1, 1982, that have exceeded their first official agency budget estimates by more than 200%. All three WPPSS power plants at issue here fall into the latter category.
 
 
 10
 The heart of the Initiative is contained in section 4. That section provides that no public agency may issue or sell bonds to finance construction or acquisition of any major public energy project "unless it has first obtained authority for the expenditure of the funds to be raised by the sale of such bonds for that project at an election" conducted in accordance with the Initiative.[9] Other provisions of the Initiative require the public agency to hire an independent consultant to prepare a draft cost-effectiveness study, followed by a period of public comment and issuance of a final draft study. The election then is held and voters within the districts encompassed by the agency and its members are entitled to vote. Bonds may not be issued in excess of the amounts of funds authorized by the voters and, of course, if the proposal is voted down no bonds may issue at all.
 
 
 11
 The Initiative alters WPPSS's functioning in two ways. Prior to the Initiative's enactment there was no explicit requirement that WPPSS obtain cost-effectiveness studies for its projects. Arguably, however, such studies were encompassed in the "Prudent Utility Practice" standard which governed both WPPSS's operation and BPA's limited oversight of WPPSS. A more important change arises from the fact that the only pre-Initiative statute governing WPPSS' bond issuing authority was Wash.Rev.Code Sec. 43.52.3411. That statute authorized WPPSS to issue bonds payable from the revenues of the utility projects whenever its board deemed it advisable. Initiative 394 accordingly imposes a substantial new hurdle to the sale of bonds essential to WPPSS' completion of the three plants. Plaintiffs argue that by conditioning WPPSS's ability to issue bonds on the outcome of a popular referendum, Initiative 394 impermissibly impairs WPPSS's obligations under the project agreements, the Net Billing Agreements, and the bond resolutions.
 
 CONTRACTS CLAUSE
 
 12
 Article I, Section 10, Clause 1 of the United States Constitution provides: "No State shall ... pass any ... Law impairing the Obligation of Contracts...." To determine whether Initiative 394 violates the contract clause, we must address two major issues. First, we must determine whether the Initiative substantially impairs WPPSS's contractual obligations to BPA or the bondholders. Second, we must determine whether the Initiative, if it substantially impairs those obligations, is nevertheless justified as a reasonable and necessary exercise of the State's sovereign power. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).
 
 IMPAIRMENT
 
 13
 Defendants argue that Initiative 394 did not substantially impair any of WPPSS's contractual obligations. Conceding that the Initiative does alter WPPSS's ability to issue bonds, they contend that the possibility of such an alteration was contemplated at the time the agreements were made. If in fact the contracts in question did allow for such an alteration, then the Initiative does not substantially impair them. See Northwestern Nat'l Life Ins. Co. v. Tahoe Regional Planning Agency, 632 F.2d 104, 106 (9th Cir.1980). We do not agree, however, that the contracts can reasonably be read as contemplating the kind of alteration of WPPSS's bonding authority effected by Initiative 394.
 
 
 14
 Defendants point to the provision of the bond resolutions in which WPPSS covenanted to "take all lawful measures required to issue and sell" the additional bonds (emphasis added). They also rely on the provision of the project agreements that promises that WPPSS will use its best efforts to sell bonds to finance completion provided "that in each case such Projects Bonds may then be legally issued and sold" (emphasis added). We realize that the defendants' arguments, particularly with regard to the latter provision, are not without force. We nevertheless believe that both provisions may be read most reasonably as promises of compliance with regular and broadly applicable bonding requirements of the state for the issuance of bonds. It is less reasonable to interpret them as leave for the state to impose a more narrowly targeted requirement of success in a popular referendum as a condition for further bonding authority by WPPSS.
 
 
 15
 We confess that our conclusion is influenced by what we perceive as the central aspect of the agreements before us. The contracting parties agreed at the outset that additional power resources were needed. The object of the agreements was to provide those resources. WPPSS recognized the importance of completion to BPA[10] and the bondholders,[11] and BPA agreed in effect to repay the bonds regardless of whether the plants were completed. The bondholders therefore had a promise of payment even without the plants, but completion of the plants unquestionably will make more energy available to finance repayment. WPPSS agreed to finish the plants with all reasonable diligence, which it clearly cannot do without issuing more bonds. In a very practical sense, the promise of completion was the only consideration BPA received for agreeing to pay the construction and financing costs. Its entitlement to the energy produced--BPA's sole benefit from the entire set of agreements--is rendered valueless if the plants are not completed. WPPSS's ability to issue additional bonds was accordingly the centerpiece of the entire arrangement. We have difficulty reading the provisions of the contracts in a way that permits destruction of their primary purpose. A promise in a contract that gives one party the power "to deny or change the effect of the promise, is an absurdity." United States Trust Co. v. New Jersey, 431 U.S. at 25 n. 23, 97 S.Ct. at 1519 n. 23 (quoting Murray v. Charleston, 96 U.S. 432, 445, 24 L.Ed. 760 (1877)).
 
 
 16
 Defendants also contend that there is no impairment because of Wash.Rev.Code Sec. 43.52.3411 ("Section 3411"), the statute that authorizes agencies such as WPPSS to issue bonds. That statute provides that, with one exception not relevant here, "all the provisions of law as now or hereafter in effect relating to revenue bonds or warrants of public utility districts shall apply to revenue bonds or warrants issued by the joint operating agency including, without limitation, provisions relating to: ... the time and place of payment of such bonds or warrants and the interest rate or rates thereon; the covenants that may be contained therein and the effect thereof...." Defendants focus on the words "now or hereafter" and contend that Section 3411 constitutes a reservation of state authority to make the changes imposed by Initiative 394. In our view, this contention overreads the statute.
 
 
 17
 The meaning and application of a state statute that is challenged as violating the contracts clause is a question of federal law. Coombes v. Getz, 285 U.S. 434, 441, 52 S.Ct. 435, 436, 76 L.Ed. 866 (1932); see American Toll Bridge Co. v. Railroad Comm'n, 307 U.S. 486, 490, 59 S.Ct. 948, 951, 83 L.Ed. 1414 (1939); Rapid Transit Corp. v. New York, 303 U.S. 573, 593, 58 S.Ct. 721, 731, 82 L.Ed. 1024 (1938). That rule necessarily extends to Section 3411 insofar as that statute dictates the application of Initiative 394 to the contracts in issue here.
 
 
 18
 The provisions of Section 3411 relied upon by defendants to establish a reservation of state power to modify contracts are ambiguous. The State has on occasion enacted statutes which explicitly exempted or subjected bond issues to the effects of subsequently enacted laws. Compare Wash.Rev.Code Sec. 53.34.120 (state covenants not to limit or alter vested rights of certain specified bondholders) with Wash.Const. art. XII, Sec. 1 (all laws relating to corporations may be altered at any time). Defendants argue that any ambiguity in the provisions at issue here should be resolved in favor of the State. We cannot agree. Although contracts which affect the public interest are interpreted so as to favor the State, when the State borrows money the State is not acting entirely in its sovereign capacity. Thus, insofar as the purely financial aspects of the agreement are concerned, reservations are not to be lightly inferred. United States Trust v. New Jersey, 431 U.S. at 25 n. 23, 97 S.Ct. at 1519 n. 23; see Restatement (Second) of Contracts Sec. 207 comment a.
 
 
 19
 We conclude that the effect of Section 3411 simply is to render applicable to future bond issues the requirements of state law then in existence so long as imposition of those requirements does not modify pre-existing contracts. We do not read it as a reservation of power applicable to the contracts at issue here. While the State unquestionably may reserve power to change some aspects of existing contracts, see Atlanta v. Metropolitan Atlanta Rapid Transit Authority, 636 F.2d 1084 (5th Cir.1981), the State has not specifically done so here. Moreover, to interpret Section 3411 as a broad reservation of power is not permissible when the statute is viewed in light of the contract clause. For example, Section 3411 could not sensibly be construed to permit the State to change by law the interest rates or redemption schedules applicable to previously issued bonds. See United States Trust Co. v. New Jersey, supra, 431 U.S. at 27-28, 97 S.Ct. at 1520-21. Section 3411 therefore cannot be applied as broadly and retrospectively as its literal language may suggest. It is a closer question whether it can be applied to allow the State to restrict a future bond issue in a manner contrary to the provisions of pre-existing contracts. We conclude that it cannot be so applied, at least in the direction dictated by Initiative 394. Section 3411 may doubtless apply many of the technical requirements of the State's bond laws to bonds issued by WPPSS in the future. Initiative 394 may itself be applied, so far as the contract clause is concerned, to future bond issues for projects not subject to the contractual constraints binding the projects in issue here. But Section 3411 does not, in our view, reserve to the State the power to apply Initiative 394 to the additional bond issues of WPPSS that were promised in the contracts before us, and that remain central to the accomplishment of their purpose.
 
 
 20
 Defendants argue that Initiative 394 did not simply affect financial obligations. They contend that it altered the structure of governance of one of the State's political subdivisions, an act inherently within the sovereign's power. The Initiative did alter the type of control the electorate could exercise over WPPSS. But the voters always had ultimate control, direct or indirect, over WPPSS by the power to elect its board. The Initiative simply altered the manner in which WPPSS can raise money. The new method does involve voter approval, but it is still the method of financing that is being altered.
 
 
 21
 Defendants also argue that a municipal corporation, such as WPPSS, remains subject to state regulation and cannot be allowed to contract itself out from state control. That argument misperceives the nature of the restriction on state action imposed by the contract clause. As a creature of the state a municipal corporation derives its power from the legislature. Once having granted certain powers to a municipal corporation, which in turn enters into binding contracts with third parties who have relied on the existence of those powers, the legislature (or here, the electorate) is not free to alter the corporation's ability to perform. Louisiana ex rel. Hubert v. New Orleans, 215 U.S. 170, 175-78, 30 S.Ct. 40, 42-43, 54 L.Ed. 144 (1909); Wolff v. New Orleans, 103 U.S. 358, 365-68, 26 L.Ed. 395 (1880); see United States Trust, 431 U.S. at 24 n. 22, 97 S.Ct. at 1519 n. 22. WPPSS remains subject to state regulation, but if the State significantly alters WPPSS's ability to perform previously negotiated agreements, it impairs obligations of contract.
 
 
 22
 Since we have concluded that neither the contracts themselves nor Wash.Rev.Code 43.52.3411 permit the state to modify the contractual obligations along the lines dictated by Initiative 394, we must next address the question whether Initiative 394 constitutes a substantial impairment of those obligations. It largely follows from what has already been said that the impairment is substantial. The issuance of additional bonds by WPPSS is essential to the performance of its contracts; it is particularly crucial to the obligation running from WPPSS to BPA. Prior to Initiative 394, the issuance of additional bonds was within the discretion of the board of directors of WPPSS. BPA had the right to ensure that the discretion was exercised in accordance with Prudent Utility Practice. An abandonment of the project was consequently likely to occur only if events caused such abandonment to be in BPA's interests as a distributor of power. Initiative 394 adds a new and unpredictable element. Bonds necessary for completion of the projects can only be issued after approval of the proposed expenditure of the proceeds by the electorate at a popular referendum. No standard can be imposed on the electorate in exercising its decision, nor can it be subjected to any review. It can reject the proposal for any reason or no reason. The addition of the referendum requirement is, we conclude, a severe impairment that defeats the expectations of the parties under their contracts. See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).
 
 
 23
 Nor do we view Initiative 394 as an insubstantial impairment prior to the time that the voters actually turn down a proposed bond issue. Defendants argue that the district court made inadequate findings to support its conclusion that the very existence of Initiative 394 injured plaintiffs by lowering the market value of WPPSS bonds and thereby increasing the costs of construction. They also contend that there was no real loss to the bondholders because they still have BPA's promise of payment. We need not fix with certainty, however, any loss in value of bonds caused by the existence of Initiative 394. It is sufficient that the additional requirements imposed by Initiative 394 impair the ability of WPPSS to carry out its covenants in the manner originally promised. United States Trust Co. v. New Jersey, supra, is conclusive on that point. In that case, the Supreme Court held that the fact that the bondholders' security provision impaired by the state was of little value was irrelevant to the constitutional determination. Absent the payment of just compensation, the repeal of a particular security provision impaired an obligation of contract even though the bondholders might have retained other contractual security. 431 U.S. at 18-19, 97 S.Ct. at 1515-16. As in United States Trust, the covenants at issue here were not superfluous. Plaintiffs were promised financing of the plants to completion, subject only to contractually specified conditions. That promise was clearly an inducement to contract. Cf. El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965) (unlimited redemption period could be changed by statute to five year redemption period when original provision was not an inducement to contract). Plaintiffs were not compensated for modification of that central provision. Initiative 394 impairs the obligation by imposing the election requirement, and that requirement is a present injury not dependent on the outcome of such an election.
 
 JUSTIFICATION
 
 24
 Having concluded that Initiative 394 does impair WPPSS's contractual obligations, we must determine whether the degree of that impairment is both reasonable and necessary to achieve a valid state interest. United States Trust, supra 431 U.S. at 29, 97 S.Ct. at 1521. Our determination whether the State's action is justified is affected by the fact that WPPSS is itself a political subdivision of the State, made up of other political subdivisions. We cannot view the contracts between WPPSS and the plaintiffs as those between private parties. Because the State is a contracting party, we give less deference to its claims of justification for impairment. Id. at 25-26, 97 S.Ct. at 1519-20.
 
 
 25
 We emphasize that the State has not attempted to justify Initiative 394 as an exercise of the State's sovereign prerogative to protect the health and safety of its citizens. Considerations of health and safety did not give rise to the Initiative, and are not offered in justification of it. Instead, defendants propose five public purposes served by Initiative 394. Essentially the five reduce to three related goals: ensuring WPPSS's public accountability; ensuring public accountability in all decisions affecting the energy and economic future of the State; and protecting the State's finances by placing controls on WPPSS's spending.[12]
 
 
 26
 Achievement of public accountability is certainly a legitimate public purpose. It is not clear, however, that Initiative 394 is either reasonable or necessary to achieve it. The Initiative was not necessary to give the public control over either WPPSS or energy and economic decision-making generally. Through the election process, the voters have always had direct or indirect control of both. At least one alternative method of achieving public accountability has actually been adopted. See, e.g., 1982 Wash.Laws (1st Ex.Sess.) ch. 43 (requiring joint operating agencies to form executive boards with outside membership). Others remain available. Cost effectiveness studies can be required without being tied to an election requirement for the issuance of bonds previously promised.[13] The existence of such alternative means of achieving accountability cast doubt on the validity of Initiative 394's application to the obligations in issue here. See United States Trust Co., 431 U.S. at 29-31 & n. 28, 97 S.Ct. at 1521-22 & n. 28. Cf. El Paso v. Simmons, 379 U.S. 497, 516-17, 85 S.Ct. 577, 587-88, 13 L.Ed.2d 446 (1965) (retroactive application "quite clearly necessary" to achieve state's purpose.).
 
 
 27
 Limitation of public spending is also certainly a legitimate state goal, but its weight is diminished in contract clause analysis when the state limits its own previous financial commitments. As the Supreme Court declared in United States Trust:
 
 
 28
 [C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contracts Clause would provide no protection at all.
 
 
 29
 431 U.S. at 26, 97 S.Ct. at 1519 (footnote omitted). These words are no less applicable when the purpose of an impairment is merely saving money, as here, rather than spending it for a broad public purpose (mass transportation) as in United States Trust. Reduced to bare essentials, the State's financial argument in support of Initiative 394 is that completion of the projects as contracted by WPPSS had become too expensive.
 
 
 30
 Even in the light of the severe cost overruns and lengthy construction delays associated with the WPPSS projects, Initiative 394 does not appear to be a reasonable measure if applied to the contracts before us. The Initiative seems somewhat narrowly targeted to modify those very contracts, rather than being part of a broad public program with incidental impairing effects. In Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the Supreme Court invalidated a statute that altered the pension plan liabilities of employers who either terminated a pension plan or closed a Minnesota office. The statute, intended to protect discharged workers, essentially required the employer to assure all employees of at least ten years standing a full pension regardless of the vesting provisions of any existing plan. Stressing the fact that the severe disruption of contractual obligations was unexpected and served only a relatively narrow public interest, the Court held that not even the presumption favoring legislative judgments as to necessity and reasonableness could save the act.
 
 
 31
 The Spannaus Court contrasted the facts of Home Building & Loan Ass'n. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), in which a temporary provision extending mortgage redemption periods was upheld. That emergency measure, enacted in response to the economic conditions of the 1930's, protected a basic societal interest rather than a favored group. Moreover, it imposed reasonable conditions, many of which were designed to protect the creditors whose rights were affected.
 
 
 32
 Defendants argue that unlike Spannaus this case involves an area historically regulated by the State and that state regulation altering contractual obligations was therefore foreseeable. It is true that the State has historically regulated power production and the operation of its political subdivisions. The State's regulation is not necessarily more foreseeable, however, than state regulation of a port authority and mass transportation involved in United States Trust, supra, where the State's impairment of bond obligations was nevertheless struck down.
 
 
 33
 Defendants argue that the cost overruns and delays which prompted passage of the Initiative were of such a magnitude as to compare with the economic conditions present in Blaisdell. We cannot agree. The concerns addressed by the Initiative were not unknown in the early 1970's. In Blaisdell the State, acting in its sovereign capacity adopted a balanced and temporary measure designed to protect broad societal interests which were threatened by the unforeseeable collapse of the world economy. In contrast, Initiative 394 sacrifices the interest of parties to contracts with the State's subdivision in order to protect the State's own finances. We cannot conclude that this imposed sacrifice was reasonable in light of changed circumstances. Compare United States Trust, 431 U.S. at 31-32, 97 S.Ct. at 1522-23 with El Paso v. Simmons, 379 U.S. at 515, 85 S.Ct. at 587.
 
 
 34
 We therefore hold that the contract clause of the United States Constitution prohibits the application of Initiative 394 to the three WPPSS projects at issue in this appeal. Our disposition makes it unnecessary to address other grounds urged by plaintiffs in support of the district court's decision. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Morgan Guaranty Trust Company of New York is bond fund trustee for bondholders of Project 1. Continental Illinois National Bank and Trust Company of Chicago is trustee for bondholders of Project 2. Seattle-First National Bank is trustee for bondholders of Project 3
 
 
 [2]
 WPPSS was created in 1957 pursuant to Wash.Rev.Code Sec. 43.52.360 which provides, in part:
 Any two or more cities or public utility districts or combinations thereof may form an operating agency (herein sometimes called joint operating agency) for the purpose of acquiring, constructing, operating and owning plants, systems and other facilities and extensions thereof, for the generation and/or transmission of electric energy and power. Each such agency shall be a municipal corporation of the state of Washington with the right to sue and be sued in its own name.
 
 
 [3]
 There is also an ownership agreement for project Number 3
 
 
 [4]
 "Prudent Utility Practice" is defined in the project agreements as:
 any of the practices, methods and acts, which, in the exercise of reasonable judgment in light of the facts (including but not limited to practices, methods and acts engaged in or approved by a significant portion of the electrical utility industry prior thereto) known at the time the decision was made, would have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.
 Defendants argue that Prudent Utility Practice is a non-standard. The standard is quite flexible. The project agreements further state that "Prudent Utility Practice is not intended to be limited to the optimum practice, method or act, to the exclusion of all others, but rather to be a spectrum of possible practices, methods or acts." We need not attempt to define its contours. It is sufficient to note that it is the standard to which the parties agreed.
 
 
 [5]
 BPA will receive only 70% of the power from one of the plants (Number 3) at issue here because the remaining 30% is owned by nonparticipants
 
 
 [6]
 The bond resolutions stated that the bonds were revenue bonds to be paid solely from "income, revenues, receipts and profits derived by the Supply System through the ownership and operation by it of the project."
 
 
 [7]
 Two additional plants were begun after the three noted earlier. BPA was not involved in those projects and work on them has been halted for the time being
 
 
 [8]
 The original total estimated cost for all five WPPSS projects was approximately $4 billion. As of May 1981 the estimated total cost for the five projects was $24 billion. The original estimate for the three plants at issue here was $1.9 billion. As of May 1981 the estimated total cost for those three plants was $12 billion
 
 
 [9]
 The major provisions of Initiative 394 are the following:
 New Section. Sec. 2.
 The purpose of this chapter is to provide a mechanism for citizen review and approval of proposed financing for major public energy projects. The development of dependable and economic energy sources is of paramount importance to the citizens of the state, who have an interest in insuring that major public energy projects make the best use of limited financial resources. Because the construction of major public energy projects will significantly increase utility rates for all citizens, the people of the state hereby establish a process of voter approval for such projects.
 New. Section. Sec. 3.
 The definitions set forth in this section apply throughout this chapter unless the context clearly requires otherwise.
 * * *
 (2) "Major public energy project" means a plant or installation capable, or intended to be capable, of generating electricity in an amount greater than two hundred fifty megawatts. Where two or more such plants are located within the same geographic site, each plant shall be considered a major public energy project. An addition to an existing facility is not deemed to be a major energy project unless the addition itself is capable, or intended to be capable, of generating electricity in an amount greater than two hundred fifty megawatts. A project which is under construction on July 1, 1982, shall not be considered a major public energy project unless the official agency budget or estimate for total construction costs for the project as of July 1, 1982, is more than two hundred percent of the first official estimate of total construction costs as specified in the senate energy and utilities committee WPPSS inquiry report, volume one, January 12, 1981, and unless, as of July 1, 1982, the projected remaining costs of construction for that project exceeds two hundred million dollars.
 * * *
 New Section. Sec. 4.
 No public agency or assignee of a public agency may issue or sell bonds to finance the cost of construction or the cost of acquisition of a major public energy project, or any portion thereof, unless it has first obtained authority for the expenditure of the funds to be raised by the sale of such bonds for that project at an election conducted in the manner provided in this chapter.
 New Section. Sec. 5.
 The election required under section 4 of this act shall be conducted in the manner provided in this section.
 * * *
 (4) Prior to an election under this section, the applicant shall submit to the secretary of state a cost-effectiveness study, prepared by an independent consultant approved by the state finance committee, pertaining to the major public energy project under consideration. The study shall be available for public review and comment for thirty days. At the end of the thirty-day period, the applicant shall prepare a final draft of the study which includes the public comment, if any.
 * * *
 New Section. Sec. 7.
 A request for financing authority pursuant to this chapter shall be considered approved if it receives the approval of a majority of those voting on the request.
 * * *
 New Section. Sec. 11.
 Section 8 of this act shall take effect immediately. The remainder of this act shall take effect on July 1, 1982. Public agencies intending to submit a request for financing authority under this act are authorized to institute the procedures specified in section 5(4) of this act prior to the effective date of this act.
 Filed January 20, 1981.
 
 
 [10]
 The project agreements recite that the generating capacity of the plants would assist BPA in attaining the objectives of the Bonneville Power Act
 
 
 [11]
 The bond resolutions recognized that operation of each project was "essential to the payment and security of the bonds."
 
 
 [12]
 At oral argument defendants attempted to justify the Initiative in part because the large amounts of bonds issued by WPPSS had made it difficult for the State to sell its own bonds. Protecting the marketability of state-issued bonds is a valid state purpose, but the contract clause was intended to ensure that the State pursues that purpose in an evenhanded manner. Initiative 394 does not attempt to limit all private borrowing; its retroactive effect is limited to altering WPPSS's ability to issue bonds. The State's argument emphasizes the fact that the State is attempting to protect its fund-raising power by limiting WPPSS's obligation to finance its projects. See United States Trust, 431 U.S. at 26, 97 S.Ct. at 1519
 
 
 [13]
 Initiative 394 contained a cost effectiveness study requirement. Despite the existence of a severability clause (Section 10) the District Court held that the statute was not severable and invalidated the entire Initiative. We do not address the correctness of that holding because counsel have represented to the court that WPPSS has already undertaken to obtain cost effectiveness studies for the three projects currently under construction. Inasmuch as the contracts clause challenge goes only to the statute's retroactive application to existing obligations, the severability issue is moot