[No. 76534-1. En Banc.]
Argued January 24, 2006. Decided December 7, 2006.

PIERCE COUNTY ET AL., *Respondents,* v. THE STATE OF WASHINGTON, *in its General Capacity and on the Relation of the Department of Licensing,* ET AL., *Appellants.*

*Robert C. Rowley* and *James J. Klauser* (of *Rowley & Klauser, LLP*), for appellants.

*Paul J. Lawrence* and *Matthew J. Segal* (of *Preston Gates & Ellis, LLP*); *Thomas F. Ahearne* and *Ramsey Ramerman* (of *Foster Pepper, PLLC*); *Clifford Freed* and *Michael C. Subit* (of *Frank Freed Subit & Thomas, LLP*); *Desmond L. Brown* (of *Sound Transit Union Station*); *Norm Maleng, Prosecuting Attorney*, and *Thomas W. Kuffel* and *Noel R. Treat, Deputies*; *Jeffery A. Richard*; *Gloria I. Thein*; and *Robert M. McKenna, Attorney General, James K. Pharris, Deputy Solicitor General, Linda M. Moran, Senior Assistant*, and *Jerald R. Anderson, Senior Counsel*, for respondents.

*Hugh D. Spitzer* and *William H. Patton* on behalf of Association of Washington Cities and Washington State Association of Counties, amici curiae.

*Roy J. Koegen, Rodney G. Wendt*, and *Mary J. Edwards* on behalf of Bond Market Association, amicus curiae.

¶1 MADSEN, J. — The issue in this case is whether Initiative Measure No. 776 (I-776) impairs bonds issued by the Central Puget Sound Regional Transit Authority (Sound Transit). Sound Transit was created to address traffic congestion in the central Puget Sound region. Pursuant to statute, Sound Transit was authorized to collect a motor vehicle excise tax (MVET) to finance a transportation system. In the years prior to passage of I-776, Sound Transit issued and sold the bonds in the public debt market in order to obtain capital needed to build the first phase of the system. It pledged the revenue from the MVET as security for its bonds. Section 6 of I-776 repealed Sound Transit's authority to collect the MVET.

¶2 In *Pierce County v. State*, 150 Wn.2d 422, 78 P.3d 640 (2003), this court upheld I-776 against a number of challenges. However, we remanded this case for a determination of whether I-776 violates article I, section 23 of the Washington Constitution. On remand, the trial court found that I-776 impairs the contract between the bondholders and Sound Transit, ruling section 6 of the initiative unconstitutional.

¶3 The intervenors (Salish Village Home Owners Association, one of its members, and Permanent Offense, sponsor of the initiative) seek reversal of the trial court ruling, contending, among other arguments, that the bonds are not impaired. The crux of the intervenors' argument appears to be that the people, through initiative, have the right to repeal taxes pledged as security for capital intensive projects such as highways and bridges when they no longer want to pay such taxes. However, the contract clause of our state constitution guarantees that "[n]o . . . law impairing the obligations of contracts shall ever be passed." WASH. CONST. art. I, § 23.

¶4 The intervenors ask this court to ignore the contract clause and long-standing case law in order to repeal MVET taxes securing Sound Transit bonds. Unfortunately, the intervenors point to no authority for their contentions, which are contrary to well-settled law and the plain language of our constitution. Indeed, many of these same claims were made and rejected nearly 150 years ago, allowing international bond markets to fund the United States expansion west, eventually into Washington. As noted by Sir Henry Sumner Maine, "I have seen the rule which denies to the several States the power to make any laws impairing the obligation of contracts criticised as if it were a mere politico-economical flourish; but in point of fact there is no more important provision in the whole Constitution. . . . [I]t is this prohibition which has in reality secured full play to the economical forces by which the achievement of cultivating the soil of the North American Continent has been performed." SIR HENRY SUMNER MAINE, POPULAR GOVERNMENT 242-43 (Liberty Classics 1976) (1885).

¶5 The constitutional impairment is clear in this case. Accordingly, we affirm the trial court.

## FACTS

¶6 In November 1996, 56.6 percent of voters in King, Pierce, and Snohomish Counties authorized Sound Transit to collect taxes in the three-county Sound Transit district (a subset of the counties) to construct a comprehensive, multi-billion dollar regional transportation system.[1] This transit system includes 70 transportation projects, including express bus service, commuter-rail lines, light-rail lines, park-and-ride lots, transit centers, and HOV (high occupancy vehicle) access improvements in King, Pierce, and Snohomish Counties. The purpose of the regional system is "to improve mobility by providing several convenient, reliable and energy-efficient alternatives to driving alone." Clerk's Papers (CP) at 2893. The projects are designed to work together and with other local transit services "to offer a region-wide integrated system of routes, schedules, and fares." *Id.* A light-rail line is currently in operation in Tacoma, and a Seattle light-rail line linking Seattle with Sea-Tac International Airport, among other destinations, is currently under construction. By 2009, it is anticipated that the first phase of the system will serve approximately 20 million commuters.

¶7 As a result of the 1996 election, Sound Transit was authorized to collect a 0.3 percent MVET and a 0.4 percent sales and use tax (sales tax) to finance construction and

---

[1] The legislature recognized that "existing transportation facilities in the central Puget Sound area are inadequate to address mobility needs of the area" and, after significant study, found that a single agency would be more effective than "several local jurisdictions working collectively at planning, developing, operating, and funding a high capacity transportation system." RCW 81.112.010. Accordingly, the legislature declared that it is the "policy of the state of Washington to empower counties in the state's most populous region to create a local agency for planning and implementing a high capacity transportation system within that region." *Id.* Sound Transit is the local agency created by the counties for planning and implementing the transportation system.

operation of the transit system.[2] The transit system is funded through a combination of local taxes, long-term bond debt, federal grants, and other revenues. Sound Transit currently imposes a 0.3 percent MVET, a 0.4 percent sales tax, and a 0.8 percent rental car tax. The Federal Transit Administration has awarded the agency a $500 million grant for the initial segment of a light-rail project.

¶8 In 1999, pursuant to chapters 81.112 and 81.104 RCW, Sound Transit issued $350 million in bonds (called the "Central Puget Sound Regional Transit Authority Sales Tax and Motor Vehicle Excise Tax Bonds, Series 1999") (hereinafter Sound Transit Bonds) to finance a portion of the initial construction of the transit system, selling the bonds to private investors through the public bond market.[3] In its bond contracts, Sound Transit pledged the revenues from the MVET and sales tax to the payment of the principal and interest on the bonds and promised to the bondholders that it would levy and collect the MVET and the sales tax while the bonds were outstanding:

Section 8. Covenants. The Authority [Sound Transit] hereby makes the following covenants with the Owners of the [Sound Transit] Bonds for as long as any of the same remain Outstanding:

(a) *Tax Levy Covenant. So long as any [Sound Transit] Bonds remain Outstanding, the Authority shall levy the special motor vehicle excise tax* authorized by RCW 81.104.160 at a rate of not less than three-tenths of one percent and the sales and use tax

---

[2] The voters also authorized Sound Transit to impose a 0.8 percent rental car tax. Along with the MVET and the sales tax, the three are referred to as the local option taxes.

[3] Municipal bonds, bonds issued by public entities, are commonly issued to finance construction projects because the initial costs of the projects are front-loaded, requiring large cash outlays in the early years. *See, e.g.,* MICHAEL V. BRANDES, NAKED GUIDE TO BONDS 8 (2003) ("Bond issuance is especially important when large capital infusions are necessary, say, to build a new school or library. It enables governments to quickly raise a significant amount of money without placing undue strain on limited financial resources."); JUDY W. TEMEL, THE FUNDAMENTALS OF MUNICIPAL BONDS 1 (5th ed. 2001) (municipal bonds have been used to fund such projects as elementary and secondary school buildings, transportation facilities, higher education buildings, government office buildings, and housing for low and moderate income families).

authorized by RCW 81.104.170 at a rate of not less than four-tenths of one percent; provided, that the Authority may levy the sales and use tax at a rate of not less than three-tenths of one percent so long as the Sufficiency Test is met.

CP at 2589 (emphasis added). The last maturity date of the bonds is 2028. The Sound Transit Bonds are payable from and secured solely by the pledge of Sound Transit's MVET and sales tax.[4] The pledge constitutes a prior lien and charge upon the taxes superior to all other charges of any kind or nature.

¶9 In November 2002, nearly four years after the Sound Transit Bonds were issued and sold to investors, I-776 was passed. The initiative reduced MVET taxes to $30 for most vehicles across the state. Although the initiative passed statewide, it was not approved by a majority of the voters in the three counties that agreed to fund a portion of Sound Transit's costs in building a transit system in the congested central Puget Sound region.

¶10 Section 6 of the initiative amended former RCW 81.104.160 (1998), deleting RCW 81.104.160(1), which authorized Sound Transit to levy and collect the MVET. Section 6 also included new statutory language providing that "[a]ny motor vehicle excise tax previously imposed under the provisions of RCW 81.104.160(1) shall be repealed, terminated and expire on the effective date of this act." CP at 21 (emphasis added).

¶11 The initiative also recognized that section 6, if passed by the voters and applied to residents in the Sound Transit district, may be prohibited by the "contract clause" of the Washington Constitution, article I, section 23. Thus, section 10 provided that:

> If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected. If the repeal of taxes in section 6 of this act is

---

[4] Sound Transit also pledged the revenues from the rental car tax, but this tax was not part of the tax levy covenant.

*judicially held to impair any contract in existence as of the effective date of this act, the repeal shall apply to any other contract.*

CP at 21 (emphasis added).

¶12 Shortly after the initiative was passed in 2002, Pierce County, the city of Tacoma, and King County, among others, challenged the initiative on multiple grounds, including whether the initiative embraced more than a single subject in violation of the Washington Constitution, article II, section 19. Sound Transit joined in the challenge. The intervenors joined the State in defending the initiative. This court held that the initiative was valid and held that the initiative did not violate the Washington Constitution, article II, section 19, among other provisions. *Pierce County*, 150 Wn.2d 422. However, this court did not address whether section 6 of the initiative violated the contract clause of the Washington Constitution by impairing the Sound Transit Bonds. Instead, this court remanded for that determination because the issue was beyond the scope of those proceedings.

¶13 On remand, the trial court found that the initiative unconstitutionally impairs Sound Transit's ability to fulfill its express contractual obligation to bondholders to collect the MVET pledged to secure the Sound Transit Bonds. Accordingly, the trial court found that the Washington Constitution, article I, section 23, bars repeal of the Sound Transit MVET (applicable only to residents in the Sound Transit district) so long as the Sound Transit Bonds remain outstanding. However, the trial court also found that the initiative's language limiting the annual MVET on most vehicles to $30 per year prevents the imposition of any additional MVET in any portion of the state except in the Sound Transit district, thus enforcing the remaining operative provisions in the initiative. The intervenors appealed the decision and we accepted direct review. The Bond Market Association, the Association of Washington Cities, and the Washington State Association of Counties all filed amicus briefs. King County and Pierce County also filed

response briefs on a separate issue, discussed below, regarding refunds of vehicle license fees.

## ANALYSIS

### Impairment of Contract under the Contract Clause

■ ¶14 This matter is here on appeal from summary judgment, which is properly granted if there are no material issues of fact and the moving party is entitled to judgment as a matter of law. An appellate court reviews a grant of summary judgment de novo. *Wash. Fed'n of State Employees v. State*, 127 Wn.2d 544, 551, 901 P.2d 1028 (1995).

■ ¶15 "A party challenging a statute's constitutionality bears the heavy burden of establishing its unconstitutionality." *Larson v. Seattle Popular Monorail Auth.*, 156 Wn.2d 752, 757, 131 P.3d 892 (2006) (citing *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000); *Hemphill v. Tax Comm'n*, 65 Wn.2d 889, 891, 400 P.2d 297 (1965)). "This standard is met if argument and research show that there is no reasonable doubt that the statute violates the constitution." *Larson*, 156 Wn.2d at 757 (citing *Amalgamated Transit*, 142 Wn.2d at 205).

■ ¶16 The intervenors contend that the trial court erred in concluding on summary judgment that the initiative unconstitutionally impairs the contract between the bondholders and Sound Transit in violation of article I, section 23 of the Washington Constitution. The Washington Constitution, article I, section 23, mandates that "[n]o . . . law impairing the obligations of contracts shall ever be passed."[5] It is "fundamental" that this prohibition against

---

[5] Similarly, article I, section 10 of the United States Constitution declares that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." It is well settled that these state and federal constitutional provisions are coextensive and are given the same effect. *See, e.g., Tyrpak v. Daniels*, 124 Wn.2d 146, 151, 874 P.2d 1374 (1994); *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 402, 869 P.2d 28 (1994).

impairing contracts reaches any form of legislative action, including direct action by the people through the initiative process. *Ruano v. Spellman*, 81 Wn.2d 820, 825, 505 P.2d 447 (1973).

¶17 "The prohibition against any impairment of contracts 'is not an absolute one and is not to be read with literal exactness.' " *Tyrpak v. Daniels*, 124 Wn.2d 146, 151, 874 P.2d 1374 (1994) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S. Ct. 231, 78 L. Ed. 413 (1934)). But when a state interferes with its own contracts, those impairments " 'face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties'." *Id.* at 151-52 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 n.15, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978)); *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 402-03, 869 P.2d 28 (1994). Sound Transit is a municipal corporation and, therefore, its contracts qualify as public contracts. *Tyrpak*, 124 Wn.2d at 152.

¶18 This court uses a three-part test to determine if there has been an impairment of a public contract: (1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is substantial impairment, is it reasonable and necessary to serve a legitimate public purpose? *Id.*; *Caritas Servs.*, 123 Wn.2d at 403; *Carlstrom v. State*, 103 Wn.2d 391, 694 P.2d 1 (1985). However, even minimal impairment of contractual expectations in public contracts violates the contract clause where there is no real exercise of police power to justify the impairment. *Tyrpak*, 124 Wn.2d at 156.

¶19 "[T]o exempt a contract from constitutional protection demands significant justification." *Id.* States and other government entities have rarely been able to justify impairing contractual obligations entered into in financial markets, such as the public bond market. *See, e.g., Caritas Servs.*, 123 Wn.2d at 405 (in almost every case, the United

States Supreme Court has held a governmental unit to its contractual obligations when it enters into financial or other markets). As the Supreme Court noted in *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 27, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977), the only time in this century the alteration of a municipal bond contract has been sustained was in 1942 when a bankrupt local government was placed in receivership by a state agency and a plan was approved that was adopted with the purpose and effect of protecting creditors (citing *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 62 S. Ct. 1129, 86 L. Ed. 1629 (1942)).

¶20 Turning to the first prong of the *Tyrpak* test, it is well settled that municipal bonds are contractual obligations protected by the contract clause. *Tyrpak*, 124 Wn.2d 146 (the outstanding bonds of the Port of Vancouver, a municipal corporation, constitute a contract between the port and the bondholders, protected by the contract clause); *Mun. of Metro. Seattle v. O'Brien*, 86 Wn.2d 339, 544 P.2d 729 (1976) (bonds issued by the municipality of Metropolitan Seattle (Metro), a municipal corporation, constitute a contract between Metro and the bondholders, protected by the contract clause); *Ruano*, 81 Wn.2d 820 (bonds issued by King County, a municipal corporation, constitute a contract between King County and the bondholders, protected by the contract clause).[6] Here, the Sound Transit Bonds constitute a contract between Sound Transit and the bond-

---

[6] *See also U.S. Trust Co.*, 431 U.S. 1 (bonds issued by the Port Authority of New York and New Jersey, a municipal corporation, were contracts protected by the contract clause of the federal constitution); *Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 18 L. Ed. 403 (1866) (bonds issued by the city of Quincy, a municipal corporation, were contracts protected by the contract clause of the federal constitution); *Wolff v. New Orleans*, 103 U.S. 358, 26 L. Ed. 395 (1881) (bonds issued by the city of New Orleans, a municipal corporation, were contracts protected by the contract clause of the federal constitution); 1 Thomas M. Cooley, The Law of Taxation 322 (4th ed. 1924) (When persons become creditors of a municipal corporation, their rights are protected by this constitutional provision forbidding the impairment of obligation of contracts.); Henry Campbell Black, An Essay on the Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts, and Against Retroactive and Ex Post Facto Laws 100 (1887) ("It is well-settled that when a State or city puts into operation a plan for the funding of its floating debt, this constitutes, when accepted, a new contract with each

holders protected by the contract clause of the Washington Constitution.

¶21 Additionally, the contractual obligations in municipal bonds protected by the constitution include the terms in the municipal bonds, the official statement, the authorizing resolutions, and the statutory provisions governing the applicable municipal corporation in existence when the bonds were issued and sold. *See, e.g., Tyrpak*, 124 Wn.2d at 152 (the contracts formed between the Port of Vancouver and its bondholders are made up of the terms of the bonds, their authorizing resolutions, and the statutes governing port districts and bond issues); *O'Brien*, 86 Wn.2d at 350 (discussing contractual obligations contained in the official statement and underlying statutory provisions applicable to the municipal corporation); *Ruano*, 81 Wn.2d at 825-27 (discussing authorizing resolutions and statutory provisions). *See also Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. State*, 696 F.2d 692, 695-96 (9th Cir. 1983) (agreement entered into by the Washington Public Power Supply System with bondholders included promises to bond purchasers made in the form of bond resolutions and the state statutes giving them effect). Thus, the contract protected by the constitution includes the terms of the bonds, their authorizing resolutions (No. R98-47, No. R98-48, and No. R99-4), the official statement, and chapters 81.112 and 81.104 RCW, governing Sound Transit.

■ ■ ¶22 Turning to the second prong of the test, a contract is impaired by legislation which alters its terms, imposes new conditions, or lessens its value. *Retired Pub. Employees Council of Wash. v. Charles*, 148 Wn.2d 602, 625, 62 P.3d 470 (2003). When assessing the impairment of a municipal bond contract, the contract is "substantially impaired" when "the legislation detrimentally affects the financial framework which induced the bondholders originally to purchase the bonds, without providing alternative or additional security." *Tyrpak*, 124 Wn.2d at 153-54. In

individual creditor, substantially beyond the further control of the legislature, and not to be altered or impaired by any subsequent modification or repeal.").

accordance with *United States Trust Co.* and other relevant federal court decisions, this court has repeatedly held that the financial framework of a bond contract is detrimentally affected and bond obligations are impaired when a law put into effect after bonds were issued diminishes a tax source (i.e., repeals a tax or reduces the tax base) that was pledged to support repayment of the bonds. *Tyrpak*, 124 Wn.2d at 155; *O'Brien*, 86 Wn.2d at 351-52; *Ruano*, 81 Wn.2d at 826-27.[7]

¶23 In *Tyrpak*, 124 Wn.2d at 148-50, this court struck down a law that would have permitted the Port of Camas-Washougal to annex areas of the neighboring Port of Vancouver, allowing the Port of Camas-Washougal rather than the Port of Vancouver to collect property taxes from the newly annexed lands. Six years prior to the legislation, the Port of Vancouver had issued and sold bonds to the public that were secured in part by those property taxes. This court held that the Port of Vancouver's bond contract with its bondholders was substantially impaired. *Id.* at 155. The court explained that "[t]he bondholders bought the bonds with the presumption that the Port of Vancouver would continue to exist in the form that was described at the time of the bonds issue" and if a "change were made, their security would be protected." *Id.* Thus, as there was no compensation for the lost security, the reduction of the pledged property constituted an unconstitutional impairment of the contract. *Id.* at 156-57.

¶24 Similarly, this court found an unconstitutional impairment in *O'Brien*. In *O'Brien*, Metro issued and sold bonds to the public that were secured by two taxes, an MVET and a sales tax. The bonds were issued to begin a capital acquisition and improvement program for a transit system. The court explained that:

> Metro's bonds were sold on the basis of representations contained in an Official Statement offering the bonds. The bondholders relied on that Official Statement in negotiations

---

[7] *See also* 1 COOLEY, *supra*, at 322-25.

leading to the sale of the bonds. In the Official Statement, Metro pledged that it would levy the 1 percent motor vehicle excise tax and the 0.3 percent retail sales tax as authorized by the legislature.

*O'Brien*, 86 Wn.2d at 350 (footnote omitted). Two years after the bonds were issued and sold, the legislature failed to remit MVET to Metro, reducing the bondholders' security.

¶25 In *O'Brien*, the State conceded that the constitution would not permit it to withdraw Metro's taxing authority to levy and collect the MVET or to divert the proceeds from the tax to some other purpose. *Id.* at 351. Instead, the State argued that its actions in failing to remit the tax proceeds to Metro did not prevent the taxes from continuing to serve as security for the bondholders because the State would remain indebted to Metro for the amounts collected for Metro and Metro continued to have an account receivable subject to future legislative appropriation. This court disagreed: "The answer . . . is simple. This is not what was promised to the bondholders." *Id.* Accordingly, this court found that the reduction in bondholders' security impermissibly impaired the contract. "In short, respondent asks the bondholders to accept an account receivable and an assumption that the state will appropriate funds to cover debt service in lieu of a financially sound operating transit system with the ability to complete its comprehensive plan." *Id.*

¶26 Again, in *Ruano*, this court found that a proposed initiative altering the security pledged for repayment of bonds violated the contract clause. In that case, King County issued and sold bonds in the public bond market to build the Kingdome. King County pledged the proceeds of a hotel/motel tax as security for the bonds, in addition to other security. *Ruano*, 81 Wn.2d at 825. King County was authorized to levy and collect the hotel/motel tax but could use the proceeds of the tax only for "paying all or any part of the cost of acquisition, construction, or operating of stadium facilities or to pay or secure the payment of all or a portion of general obligation bonds issued for such pur-

pose." *Id.* at 826. An initiative was proposed after the bonds were sold, proposing to take away King County's authorization to build the Kingdome. The appellant in that case argued that the bond contract was not impaired because King County could continue to collect the pledged tax. This court disagreed:

> Appellant contends, without citing to authority, that the decision to terminate the stadium would in no way affect the levy of the special excise tax. Yet substantial doubt is obviously created as to the continued collection of a tax which can be levied for a single purpose when that purpose cannot be realized.

> The situation is analogous to an effort by the legislation to repeal the authority to levy this tax. That such an effort would be futile and in violation of the constitution is the holding of *Von Hoffman v.[ City of] Quincy*, 71 U.S. (4 Wall.) 535, 554, 18 L. Ed. 403 (1866), wherein the United States Supreme Court said:

> > It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.

*Ruano*, 81 Wn.2d at 826-27. Accordingly, the court in *Ruano* found that repeal of the hotel/motel tax pledged as security to the bondholders, as proposed by the initiative, would constitute an impermissible impairment of the bond contract in violation of the constitution.

¶27 Applying the second prong of the *Tyrpak* test, we conclude that section 6 of the initiative impaired Sound Transit's contract with its bondholders. Under the terms of the bonds, Sound Transit pledged the MVET and covenanted to collect the MVET while the bonds were outstanding. Section 6 of the initiative expressly withdrew Sound Transit's ability to levy and collect the MVET, reducing the bondholders' security. Moreover, section 6 of the initiative alters the terms of the bonds because Sound Tran-

sit will be unable to fulfill its covenant to levy and collect the MVET while the Sound Transit Bonds are outstanding.

¶28 This impairment is substantial because it detrimentally affects the financial framework which induced the bondholders to purchase the bonds, without providing alternative or additional security.[8] As in *Tyrpak*, *O'Brien*, and *Ruano*, the bondholders were induced to purchase the bonds based on the promise that Sound Transit would continue to levy and collect the MVET, among other taxes. Importantly, the initiative offers no alternative or additional security to the bondholders; it simply withdraws Sound Transit's authorization to levy and collect the MVET. At the time the bonds were issued and sold, Sound Transit had an unconditional grant of power to levy and collect the MVET, subject to limitations on amount and receipt of voter approval, which it obtained. The pledge of the two major taxes, the sales tax and the MVET, was a critical part of the financial framework inducing the bondholders to invest in the bonds. Investors purchasing the Sound Transit Bonds were told that they could rely on two major revenue streams, which are quite different in character, to secure the bonds. The sales tax depends on the amount of taxable sales that occur within Sound Transit's taxing district each month. Such monthly sales vary based on the strength/ weakness and performance of the local economy and are therefore somewhat volatile. By contrast, the MVET revenue depends on the value of all currently owned vehicles. MVET revenues provide a stable revenue stream because vehicle owners pay the tax regardless of their current rate of spending on new purchases. Significantly, while Sound Transit reserved the right to reduce the sales tax pledged and covenanted to bondholders, the Sound Transit Bonds

---

[8] Contrary to the dissent's assertion, we do not hold that a claimant need not establish prejudice to demonstrate substantial impairment of a contract. Rather, we follow well-established case law for determining whether such prejudice exists in the context of bond contracts. In contrast, the dissent would substitute ad hoc judicial determinations of prejudice for the standards that have evolved over decades of case law.

did not reserve the right to reduce the MVET pledged to bondholders in any amount.

¶29 The intervenors contend that I-776 did not impermissibly impair the contract because the market for the bonds remained strong following the law's enactment. In agreement, the dissent asserts that a reduction in the bond's current market value is "the ultimate evidence a bond contract obligation has been impaired," given the rationality and efficiency of the marketplace. Dissent at 53, 63.

¶30 The United States Supreme Court rejected this reasoning nearly 30 years ago in *United States Trust Co.*, 431 U.S. at 18-19. There, the parties presented credible but conflicting evidence on whether the repeal of a bond contract's security provision negatively impacted the current market price of the affected bonds. As here, supporters of the repeal presented evidence showing that the bonds retained a favorable credit rating and market price. The Court regarded the focus on current market value as inappropriate, stating, "Factors unrelated to repeal may have influenced price. In addition, the market may not have reacted fully, even as yet, to the covenant's repeal, because of the pending litigation and the possibility that the repeal would be nullified by the courts." *Id.* at 19. In the Court's view, irrespective of the bonds' current market value, substantial impairment of the bond contract occurred when the legislature repealed an important security provision upon which the bondholders relied in purchasing the bonds without replacing it with a comparable security provision or offering just compensation. *Id.*

¶31 The record here illustrates the wisdom of *United States Trust Co.*'s rejection of the current market value standard proposed by the intervenors. In an attempt to disprove that repeal of the MVET prejudiced bondholders, intervenors presented evidence that Sound Transit's bond credit rating remained steady in the wake of I-776. Ironically, however, the credit rating was based, in part, on the credit evaluator's prediction that this court would "affirm[ ] the bond contract" in adherence to well-established case

law and hold that Sound Transit could continue to collect the MVET. CP at 4142. Thus, the stability of Sound Transit's credit rating reflects the market's assumption that this court will nullify I-776 to the extent it prevents Sound Transit from fulfilling its contractual obligations. While the intervenors and the dissent would have us depend on the rationality of the marketplace to decide whether a law reduces the value of a contract, the market apparently has placed its faith in this court to act rationally by protecting the value of the contract in adherence to well-established case law governing contract clause claims.

¶32 The intervenors further assert that the bond contract was not impermissibly impaired because Sound Transit has other revenue to pay the principal and interest on the Sound Transit Bonds. The intervenors point out that tax revenue from the sales tax, which accounts for approximately 79 percent of Sound Transit's tax revenue, could be used to pay the bondholders. Tax revenue from the MVET accounts for approximately 21 percent of Sound Transit's tax revenue. Moreover, the intervenors claim that prior tax revenue collected was more than sufficient to pay off the bonds, thus "fully" securing the bonds, even though Sound Transit used such revenue to build and operate the transit system as authorized by statute and by the bond contract. Thus, the intervenors claim there is no impairment due to prior and future revenue.

¶33 This argument has no merit and has been soundly rejected by this court. In *O'Brien*, for example, the court acknowledged that the revenues from two tax sources substantially exceeded the requirements for debt service on the bonds. However, the court observed that this excess coverage was an important reason for a favorable rating received from municipal bond rating services. *O'Brien*, 86 Wn.2d. at 350. The excess coverage was also an important factor in the decision of the bondholders to purchase the bonds. *Id*. Thus, the court reasoned, "The bonds could not have been sold at the same price and interest rate if the coverage had been significantly less than represented." *Id*.;

*see also Ruano*, 81 Wn.2d at 827 (rejecting appellant's argument that bonds were not impaired because the entire tax base of King County secures the general obligation bonds because "it is not the contract entered into with the bond buyers").[9]

¶34 The third prong of the test is whether the challenged legislation is " 'nevertheless justified as a reasonable and necessary exercise of the State's sovereign power.' " *Tyrpak*, 124 Wn.2d at 156 (quoting *Cont'l Ill.*, 696 F.2d at 697). This third prong of the impairment test strikes a balance between the inherent police power of the state and the legitimate expectations of those who enter into contracts. *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 23-24). As this court explained, " 'a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons.' " *Id.* (quoting *U.S. Trust Co.*, 431 U.S. at 25.) Nevertheless, to exempt a contract from constitutional protection demands significant justification. *Id.* Hence, " 'even minimal impairment of contractual expectations violates the contract clause where there is no real exercise of police power to justify the impairment.' " *Id.* (quoting *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 9, 776 P.2d 721 (1989)).

¶35 In this case, the intervenors claim that a "change in tax policy" justifies reducing the bondholders' security. However, this justification has been soundly rejected for

---

[9] Like the intervenors, the dissent would have us disregard relevant case law and conclude that Sound Transit bondholders were not harmed by the MVET's repeal because projected sales tax revenues greatly exceed the amount payable to bondholders. In the dissent's view, there is no contractual impairment when there is no realistic possibility, according to a judge, that bondholders will not be repaid. However, the standard we apply today acknowledges that in assessing whether repeal of a pledged revenue source harms bondholders, it is not the court's role to predict the future or to second-guess a bond purchaser's risk management decisions by making ad hoc determinations about the importance of contractual security provisions. To hold otherwise would create considerable uncertainty as to the reliability of pledged funding sources and thus imperil the ability of local governments to finance important public works projects through the bond market.

over a century. *See, e.g.*, *Tyrpak*, 124 Wn.2d 146 (no justifi-
cation for impairment when purpose of law is to reduce
taxing power of one entity to benefit another); *O'Brien*, 86
Wn.2d at 350-52 (constitution prevents legislature from
withdrawing taxing power or diverting the proceeds to
some other use when tax pledged to bonds); *Ruano*, 81
Wn.2d at 826-27 ("futile and in violation of the constitution"
to repeal authority of municipality to levy tax when action
reduced bondholders' security (citing *Von Hoffman*, 71 U.S.
(4 Wall.) at 554-55)).

¶36 Next, the intervenors contend that the initiative did
not impair the Sound Transit bonds because "the power
. . . to change tax policy" far outweighs any impairment of
the bond contract created by the initiative and Washington
Constitution article VII, section 1 prohibits surrendering or
contracting away the power to tax, which the intervenors
contend Sound Transit did. The intervenors point to no
authority for this contention. Indeed, long-standing author-
ity is to the contrary. For example, in *Continental Illinois*,
696 F.2d at 699-700, the court rejected a similar argument
made by defendants that a Washington municipal corpora-
tion remains subject to state regulation and cannot be
allowed to contract itself out from state control. As the
court explained, the "argument misperceives the nature of
the restriction on state action imposed by the contract
clause. As a creature of the state, a municipal corporation
derives its power from the legislature. Once having granted
certain powers to a municipal corporation, which in turn
enters into binding contracts with third parties who have
relied on the existence of those powers, the legislature (or
here, the electorate) is not free to alter the corporation's
ability to perform." *Id.* (citing *Louisiana ex rel. Hubert v.
New Orleans*, 215 U.S. 170, 175-78, 30 S. Ct. 40, 54 L. Ed.
144 (1909); *Wolff v. New Orleans*, 103 U.S. 358, 365-68,
26 L. Ed. 395 (1880)); *see also O'Brien*, 86 Wn.2d at 350
(State bound not to withdraw taxing authority under

the constitution).[10] We find no merit in the justifications offered by the intervenors for the impairment of Sound Transit Bonds.

¶37 Consistent with long-standing law, we hold that section 6 of the initiative impairs Sound Transit's contractual obligations with its bondholders in violation of the contract clause. WASH. CONST. art. I, § 23.

## Validity of Bond Contract

¶38 The intervenors assert that the bond contract is invalid, first challenging the formation of Sound Transit and then the terms of the bond contract. We find no merit to any of these claims.

¶39 Turning first to the intervenors' formation challenges, intervenors argue that Sound Transit was improperly formed because the residents in King, Pierce, and Snohomish Counties did not ratify the formation of Sound Transit. As discussed above, when the voters approved taxes to implement the first phase of Sound Transit's transit system in 1996, the voters acted in full compliance with the law in effect at that time.

¶40 Nevertheless, the intervenors claim the voters were not entitled to rely on RCW 81.112.030(8), part of the enabling statute effective in 1996, because they allege that prior amendments to the statute were improper. First, the intervenors claim that the legislature's amendments in 1993 to RCW 81.112.030, which in part removed the requirement that voters ratify the formation of Sound Transit, violated Washington Constitution article II, section 19 because the amendment was part of an appropriations

---

[10] Intervenors also claim that there was no impairment because years after the Sound Transit Bonds were issued and sold, Sound Transit issued new bonds that did not have the MVET pledged and those had a good rating. Intervenors cite no authority for this proposition, but more importantly, the argument misses the point—the bond contracts at issue here were explicitly secured by the MVET.

bill.[11] Thus, the intervenors argue that the ratification requirement remained in force.

¶41 Intervenors fail to recognize that the legislature's 1994 amendment to RCW 81.112.030 superseded the 1993 act. "[W]here a governing body takes an otherwise proper action later invalidated for procedural reasons only, that body may retrace its steps and remedy the defects by reenactment with the proper formalities." *Henry v. Town of Oakville*, 30 Wn. App. 240, 246-47, 633 P.2d 892 (1981). In *Henry* itself, the Court of Appeals allowed a town to reenact and ratify an ordinance, originally passed without proper notice under the open meetings laws, authorizing a bond issue. *See also Eugster v. City of Spokane*, 110 Wn. App. 212, 39 P.3d 380 (2002) (holding that a procedural challenge to the validity of a city ordinance was moot since the ordinance had subsequently been properly enacted).

¶42 Although our courts have not had occasion to apply this principle to claims arising out of article II, section 19 of the constitution, other jurisdictions have applied it in this constitutional context. In *Mispagel v. Missouri Highway & Transportation Commission*, 785 S.W.2d 279 (Mo. 1990), a Missouri statute was challenged on the ground that the bill dealt with more than one subject. The Missouri Supreme Court rejected this challenge, holding that since the reenacting bill was not subject to the alleged infirmity asserted against the 1985 bill, "[a]ny defect in the enactment, therefore, has been cured." *Id.* at 281. In *Nichols v. Tullahoma Open Door, Inc.*, 640 S.W.2d 13 (Tenn. App. 1982), the Tennessee Court of Appeals ruled moot a challenge to a Tennessee statute on the basis that the subsequent reenactment and recodification of the statute cured any constitutional defect. In *Honchell v. State*, 257 So. 2d 889 (Fla. 1971), the Florida Supreme Court rejected a claim that a statute defining criminal activity was invalid because its original enactment violated "double subject" provisions in the Florida Constitution

---

[11] Washington Constitution article II, section 19 provides, "No bill shall embrace more than one subject, and that shall be expressed in the title."

because the statute in question had been reenacted. And in another case, the Florida Supreme Court held that any defect in the title of the original act creating a Turnpike Authority had been cured by the adoption of the revised statutes, including the act. *Spangler v. Fla. State Turnpike Auth.*, 106 So. 2d 421 (Fla. 1958).

¶43 We conclude that even if the 1993 amendments to RCW 81.112.030(8) were not properly included in the 1993 transportation appropriations bill, in 1994 the legislature reenacted the statute in a bill, which the intervenors do not challenge as violating Washington Constitution article II, section 19. And the 1994 amendments, like the 1993 amendments, removed any reference to a requirement that the public vote on ratification of the formation of a regional transit authority. The 1994 amendments, therefore, ratified and cured any defect in the 1993 enactment.

¶44 Next, the intervenors claim that the 1994 act was ineffective, violating Washington Constitution article II, section 37 because it did not reprint the full text of RCW 81.112.030, the statute in effect in 1992.[12] Instead, the 1994 act reprinted the full text of RCW 81.112.030, the amended section that was effective in 1993. The intervenors' point is not well taken. Washington Constitution article II, section 37 requires the legislature to set forth the full length of the relevant act or section to be amended. Since the 1994 legislature was entitled to assume that the 1993 act was constitutional, the legislature properly complied with article II, section 37 by setting forth the relevant section effective at the time of the legislature's action. *See, e.g., State v. Heckel*, 143 Wn.2d 824, 832, 24 P.3d 404 (2001). Accordingly, we find no constitutional infirmity with the enabling statute.

¶45 Next, the intervenors maintain that the legislature had no authority to enact RCW 81.112.030(2), authorizing the elected officials of a class of counties to

---

[12] Washington Constitution article II, section 37 provides that "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

decide whether to establish a regional transit authority, a municipal corporation. The intervenors rely on Washington Constitution article XI, section 10 as authority for their contention that a public vote is constitutionally mandated.[13] The intervenors misconstrue this constitutional provision. Under the plain language of this provision, only *cities and towns* require a vote by the electorate to organize or incorporate. WASH. CONST. art. XI, § 10 (*"Cities and towns* heretofore organized, or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election, shall so determine." (emphasis added)). It is well settled that other municipal corporations, such as Sound Transit, do not. *See, e.g., Rood v. Water Dist. No. 24 of King County*, 183 Wash. 258, 262, 48 P.2d 584 (1935) ("There is no restriction in our constitution on the power of the *legislature* to create municipalities, other than the requirement that it shall be done by general, and not by special, law."); WASH. CONST. art. II, § 28(6) ("[t]he legislature is prohibited from enacting any private or special laws in the following cases: . . . [f]or granting *corporate* powers or privileges" (emphasis added)).

¶46 The intervenors repeatedly claim that "the legislature cannot do indirectly that which it is prohibited from doing directly." While that principle is undoubtedly true, it has no relevance in this context. Nothing in the constitution prohibits the legislature from authorizing the formation of a municipal corporation by local legislative bodies. Indeed, the statutes under challenge here are closely analogous to those upheld in *CLEAN v. State*, 130 Wn.2d 782, 928 P.2d 1054 (1996) and in *Brower v. State*, 137 Wn.2d 44, 969 P.2d 42 (1998). In sum, intervenors offer no authority for the contention that RCW 81.112.030, in effect when the voters approved of the taxes, was unconstitutional because it did

---

[13] Washington Constitution article XI, section 10 provides in relevant part: "Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization and classification to population, of cities and towns, which laws may be altered, amended or repealed. Cities and towns heretofore organized, or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election, shall so determine."

not require the voters to ratify the formation of Sound Transit.[14]

¶47 The intervenors' reliance on Washington Constitution article I, section 19 is equally unavailing.[15] This section requires merely that, for matters subject to election, elections must be free and equal. *State v. Wilson*, 137 Wash. 125, 132, 241 P. 970 (1925) ("The provision does not mean that voters may go to the polls at any time and vote on any question they see fit, but only at the stated times provided by the statutes relating to elections."). Moreover, Washington Constitution article I, section 19 does not apply to appointed bodies such as the Sound Transit board. *See, e.g., Granite Falls Library Capital Facility Area v. Taxpayers of Granite Falls Library Capital Facility Area*, 134 Wn.2d 825, 840, 953 P.2d 1150 (1998).

¶48 Next, the intervenors contend that the delegation of taxing authority to Sound Transit was unconstitutional because its board members are appointed. As mentioned above, Sound Transit's board members consist of elected officials in the three counties plus the secretary of transportation or his or her designee. RCW 81.112.040(1). The intervenors' argument lacks merit.

¶49 Initially, we observe that intervenors do not even mention our lengthy discussion in *Larson*, 156 Wn.2d at 756-64, regarding Washington Constitution article XI, section 12 and article VII, section 9, which expressly provide that the legislature may delegate local taxing author-

---

[14] The intervenors also claim that the formation of Sound Transit was unconstitutional because it expanded the debt limit of the counties. The intervenors are mistaken. Washington Constitution article VIII, section 6 provides in part that "[n]o county, city, town, school district, *or other municipal corporation* shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election." (Emphasis added.) By the plain language in the provision, the debt of a separate municipal corporation is not considered the debt of a county.

[15] Washington Constitution article I, section 19 provides that "[a]ll Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."

ity to municipalities.[16] It is equally well settled that it is constitutionally permissible for the legislature to delegate taxing authority to municipal corporations with appointed board members, provided certain standards or guidelines are provided and procedural safeguards exist. *Larson*, 156 Wn.2d at 761-62; *King County Water Dist. No. 54 v. King County Boundary Review Bd.*, 87 Wn.2d 536, 545, 554 P.2d 1060 (1976); *Barry & Barry, Inc. v. Dep't of Motor Vehicles*, 81 Wn.2d 155, 159, 500 P.2d 540 (1972). Under the two-part test, the legislature first must provide standards or guidelines which define in general terms what is to be done and identify the entity which is to accomplish it. *Larson*, 156 Wn.2d at 761-64. Second, procedural safeguards must exist to control arbitrary administrative action and any administrative abuse of discretionary power. *Id.*

¶50 In this case, the two-part test is satisfied. The legislature has provided the necessary guidelines defining in general terms what is to be done and has properly identified the entity which is to accomplish it. In RCW 81.112.030, the legislature authorized two or more contiguous counties each having a population of more than 400,000 persons to establish a "regional transit authority." Such authority is to "develop and operate a high capacity transportation system as defined in chapter 81.104 RCW." *Id.* The regional transit authority is responsible for planning, construction, operations, and funding of transit systems within its area. *See, e.g.*, RCW 81.104.070(2). The regional transit authority is authorized, after receiving voter approval, to levy taxes and issue bonds to finance the transit system. *See, e.g.*, RCW 81.104.140, 81.112.030, .130. The taxes authorized, after voter approval, are limited in scope and clearly defined. *See, e.g.*, former RCW 81.104.160(1) (regional transit authorities may submit an authorized proposition to the voters and, if approved, may levy and collect an excise tax at a rate approved by the voters,

---

[16] Although this case was argued in this court before *Larson* was published, the intervenors have made no effort to address it in any postargument supplementation.

but not exceeding 80/100ths of one percent on the value of every motor vehicle owned by a resident of the taxing district, solely for the purpose of providing high capacity transportation service); RCW 81.104.170 (regional transit authorities may submit an authorizing proposition to the voters and, if approved by a majority of persons voting, fix and impose a sales tax solely for the purpose of providing high capacity transportation service; the maximum rate of such tax shall be approved by the voters and shall not exceed one percent of the sales price (in the case of a sales tax) or value of the article used (in the case of a use tax)). Thus, the legislature has defined in general terms what is to be done and the entity that is to accomplish it.

¶51 Second, sufficient procedural safeguards exist to control arbitrary administrative action and administrative abuse of discretionary power. The taxes imposed by Sound Transit have been clearly set forth and approved by the voters. Moreover, Sound Transit contracts with the Department of Licensing to collect the tax as provided by RCW 81.104.190. Additionally, although the members on the board are appointed, all but one of the board members are elected officials, providing the taxpayers a vote. Finally, as illustrated by *Larson*, the courts provide any aggrieved person with standing to challenge any discriminatory, arbitrary, or unreasonable rates. Thus, we find sufficient standards, guidelines, and procedural safeguards and find no constitutional infirmity.

¶52 Turning to the intervenors' challenge to the validity of the bonds, the intervenors contend that the Sound Transit Bonds were invalid because Sound Transit exceeded its statutory authority under RCW 81.104.180. RCW 81.104.180 provides in relevant part:

> [R]egional transit authorities are authorized to pledge revenues from the employer tax authorized by RCW 81.104.150, the special motor vehicle excise tax authorized by RCW 81.104.160, and the sales and use tax authorized by RCW 81.104.170, to retire bonds issued solely for the purpose of providing high capacity transportation service.

¶53 The intervenors claim that Sound Transit was authorized to pledge the MVET revenue stream only in an amount required to service the debt (payment of principal and interest payments on the debt) and could not pledge the entire revenue stream and covenant to levy and collect the tax as authorized by statute and approved by the voters in the Sound Transit district. This argument is without merit. In *O'Brien*, 86 Wn.2d at 350-51, the municipal corporation pledged tax revenues from MVET and sales tax as security for Metro's bond obligations and promised to collect those taxes as authorized by state "until all the outstanding bonds had been retired." As mentioned above, the excess coverage provided the statutorily authorized pledge "was an important reason for a favorable rating received from municipal bond rating services" and "was also an important factor in the decision of the bondholders to purchase the bonds." *Id.* at 350. Sound Transit's pledge of the MVET revenues is equivalent to that in *O'Brien* and in no way exceeds its statutory authority.[17]

¶54 We hold that the formation of Sound Transit was constitutional and that the Sound Transit Bonds are valid contractual obligations.

## Additional Claims

¶55 The intervenors assert that if the initiative impairs the Sound Transit Bonds, this court should order Sound Transit to retire the Sound Transit Bonds. Although the intervenors concede that under the bond contract, the bonds are outstanding until 2028, that Sound Transit has

---

[17] Although the dissent cites no language of reservation, the dissent claims that the legislature reserved the power to take away Sound Transit's ability to levy the MVET tax while Sound Transit's bonds were outstanding. The dissent is incorrect. As noted earlier, at the time the bonds were issued and sold, the legislature provided Sound Transit with express authority to levy the MVET, a "dedicated funding source," RCW 81.104.140, to issue long-term bonds, RCW 81.112.140, and to pledge the revenues for the MVET for the life of outstanding bonds, RCW 81.104.180, subject to limitations on amount and receipt of voter approval, which it obtained. *See also* RCW 81.104.130 (agency delegated financial responsibility to determine debt-to-equity ratios). As noted, Sound Transit's authority to levy and pledge the revenue for the life of the bonds is every bit as clear as in *O'Brien*.

pledged the MVET as security for the bonds, and that Sound Transit has covenanted to collect the MVET for as long as the bonds are outstanding, the intervenors argue that the court should require early retirement because Sound Transit retained the right to defease the bonds, among other rights. This argument is without authority and violates several constitutional principles.[18]

¶56 Article I, section 23 of the Washington Constitution declares that "[n]o . . . law impairing the obligations of contracts *shall ever be passed*" (emphasis added). There is no constitutional authority for a court to rewrite the contract. *See, e.g., Tyrpak*, 124 Wn.2d 146 (striking law that impaired bond contract); *Ruano*, 81 Wn.2d 820 (striking initiative that impaired bond contract); *O'Brien*, 86 Wn.2d 339 (prohibiting legislature from taking action that reduced bondholders' security); *Caritas Servs.*, 123 Wn.2d 391 (legislative provisions impaired state contracts and could not be applied to contract in effect prior to legislation); *see also Cont'l Ill.*, 696 F.2d 692 (initiative impaired bond contracts, could not be applied to bonds issued prior to the initiative); *U.S. Trust Co.*, 431 U.S. 1 (legislation repealing covenant which provided bond security impaired bonds, and covenant could not be repealed while bonds were outstanding).[19]

¶57 Indeed, the initiative itself recognized that the constitution expressly protects contracts issued prior to legislation "[i]f the repeal of taxes in section 6 of this act is judicially held to impair any contract in existence as of the effective date of this act, the repeal shall apply to any other contract." CP at 21 (section 10 of I-776). Such judicial intervention is contrary to the purpose of the contract clause, which is to encourage trade and the lending of credit "by promoting confidence in the stability of contractual obligations." *U.S. Trust Co.*, 431 U.S. at 15.

---

[18] The State joined in this argument. At oral argument, the State conceded that there was no authority for this position.

[19] *See also Von Hoffman*, 71 U.S. 535 (legislation limiting taxing authority of city impaired bond contracts and could not be applied to limit provisions in bonds); *Wolff*, 103 U.S. 358 (same).

¶58 Moreover, such unprecedented judicial intervention would result in an end run around other constitutional prohibitions. This court upheld the constitutionality of the initiative under article II, section 19, finding that the initiative contained a single subject and an appropriate title.[20] *Pierce County*, 150 Wn.2d 422. Crucial to our determination was section 7 of the initiative being precatory, mere "policy fluff" and not enforceable. *Id.* at 434-36. Section 7 of the initiative provided in part that "[i]f the repeal of taxes in section 6 of this act affects any bonds previously issued for any purpose relating to light rail, the people expect transit agencies to retire these bonds." CP at 21. The intervenors ask this court to "revive" this inoperative part of the initiative, contrary both to the contract clause and article II, section 19 of the constitution. *See Pierce County*, 150 Wn.2d at 444 (Chambers, J., dissenting) (suggesting that I-776 violates Washington Constitution article II, section 19 because section 7 of the initiative constitutes a second subject: "$30 license tabs across the entire state are not germane to the financing" of a local transit system).

¶59 The law should not be construed to do indirectly what it cannot do directly. *Gelpcke v. City of Dubuque*, 68 U.S. (1 Wall.) 175, 192, 17 L. Ed. 520 (1864) ("It is almost unnecessary to say, that what the legislature cannot do directly, it cannot do indirectly. The stream can mount no higher than its source."); *W. River Bridge Co. v. Dix*, 47 U.S. (6 How.) 507, 516, 12 L. Ed. 535 (1848) ("All the powers of the states, as sovereign states, must always be subject to the limitations expressed in the United States Constitution . . . . What is forbidden to them, and which they cannot do directly, they should not be permitted to do by color, pretence, or oblique indirection."). We will not give effect to a provision that would result in a violation of the single subject requirements by directing the parties to order their financial affairs in a manner that coerces compliance with

---

[20] Washington Constitution article II, section 19 provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title."

unlawful legislation. To do so would, in Chief Justice Marshall's words, "subvert the very foundation of all written constitutions." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L. Ed. 60 (1803).[21]

¶60 Accordingly, consistent with the constitution and long-standing law including *Tyrpak*, *Ruano*, and *O'Brien*, we reject the intervenors' invitation to rewrite the bond contract and ignore the constitution.

## Refund of Vehicle License Fees

 ¶61 The intervenors claim that the trial court erred in issuing its "Final Order Establishing the Terms for the Refunds of the Local Vehicle Licensing Fees and Gross Weight Vehicle Fees." In *Pierce County*, this court remanded the case to the trial court for refunding of those

---

[21] Although not argued by the parties, the dissent offers another reason to uphold repeal of the MVET. It claims that the "remedy" of specific performance is unavailable unless the bondholders can demonstrate that a state remedy for breach of contract is not possible. The dissent's asserts that "so long as a damage remedy exists, the contract is unimpaired." Dissent at 63. This has never been the law in Washington. Rather, under Washington case law, we analyze the claim of unconstitutional impairment of a contract by applying the three-part test discussed above. *See, e.g., Tyrpak*, 124 Wn.2d 146; *Caritas Servs.*, 123 Wn.2d 391. If that test is met, that ends the inquiry. The dissent reliance on the analysis from the Seventh Circuit in *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) is inapposite under Washington law. Although every contract dispute does not implicate the contract clause, as discussed above, the finding of an unconstitutional impairment of municipal bonds in this case is supported by our case law as well as United States Supreme Court law. *See, e.g., U.S. Trust Co.*, 431 U.S. 1. In addition, we doubt that the underpinnings for the Seventh Circuit's approach supports it and the dissent's sweeping application of the case. *See, e.g., Jackson Sawmill Co. v. United States*, 580 F.2d 302 (8th Cir. 1978) (in that case, no attempt was made to use the law to impair a contract); *E&E Hauling, Inc. v. Forest Pres. Dist. of Du Page County*, 613 F.2d 675, 679 (7th Cir. 1980) (citing with approval *U.S. Trust Co.*, 431 U.S. 1, explaining that a "statute which authorizes one party to assume greater risks and thus permits a diminution of pledged revenues impairs the other party's contract obligations"); *see also St. Paul Gas Light Co. v. St. Paul*, 181 U.S. 142, 21 S. Ct. 575, 45 L. Ed. 788 (1901), relied on by the dissent (case did not involve legislative impairment, only a dispute as to whether the contract required future payment for lamps no longer in use). Moreover, the dissent's assertion that federal case law is binding is plainly erroneous. *See, e.g., City of Seattle v. Mighty Movers, Inc.*, 152 Wn.2d 343, 353, 96 P.3d 979 (2004) (when interpreting our state constitution, federal case law interpreting federal constitutional provisions is persuasive, not binding precedent). We are more persuaded by long-standing case law in Washington and by relevant United States Supreme Court law discussed above.

\

fees. 150 Wn.2d 422. Pursuant to the trial court's order, the State refunded the $15 vehicle license fees paid by King County and Pierce County residents, which the State had held during the pending litigation in *Pierce County*. The intervenors claim that the two counties were required to refund the vehicle license fees with interest. The intervenors' claim is without merit. Contrary to their assertion, RCW 4.56.110, which provides for interest on certain judgments, is inapplicable because a refund of fees is not a judgment. Moreover, the intervenors fail to point out that neither the initiative nor the relevant statutory provisions governing vehicle licensing fees provide for payment of interest on refunds of such fees. *See* CP at 19-22; *compare* RCW 46.68.010 (no provision for interest on refunds of vehicle license fees) *with* RCW 82.02.080 (provides for interest on refunds of impact fees). Thus, the trial court did not err in issuing its order because there is no authority for interest to be paid on refunds of such fees.[22]

## Attorney Fees

¶62 The intervenors request attorney fees under the common fund doctrine. Attorney fees are not awarded unless expressly authorized by contract, statute, or recognized equitable exception. *See, e.g., Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 71-72, 847 P.2d 440 (1993); *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 540, 585 P.2d 71 (1978). Under the common fund doctrine, a narrow equitable exception, attorney fees will be awarded only when a party creates or preserves a common fund for the benefit of others in addition to themselves. *Bowles*, 121 Wn.2d at 70-71; *Seattle Sch. Dist. No. 1*, 90 Wn.2d at

---

[22] The intervenors also claim that the trial court erred in failing to enter a final judgment disposing of all claims after this court's remand in *Pierce County*. On remand, the trial court entered the following items: "Final Order Establishing the Terms for the Refunds of the Local Vehicle Licensing Fees and Gross Weight Vehicle Fees"; "Order Granting Sound Transit's Motion for Partial Summary Judgment and Denying the Intervenor Defendants' Motion for Partial Summary Judgment"; and "Judgment" (stating that "there are no remaining claims and final judgment is now properly entered"). We find no error by the trial court.

540-45. Here, the intervenors did not prevail and create or preserve a common fund. Accordingly, the intervenors are not entitled to attorney fees.

## CONCLUSION

¶63 As a result of a vote in 1996 by citizens in King, Pierce, and Snohomish Counties, the legislature authorized Sound Transit to collect taxes in the three-county region in order to construct a transportation system. Based on its statutory authority, Sound Transit pledged the revenue from these taxes to the payment of principal and interest on bonds necessary to finance the transportation system. Nearly four years after the Sound Transit Bonds were issued and sold to investors, I-776 was proposed to repeal Sound Transit's authority to collect the MVET. Although a majority of the voters in the three-county transportation district did not approve the initiative, I-776 was passed by a majority of the State's voters.

¶64 Section 6 of the initiative provides for repeal of the MVET, while section 10 anticipates that the MVET repeal may unconstitutionally impair some contracts existing at the effective date of the act.

¶65 In this case we are asked to decide whether I-776 conflicts with Washington Constitution article I, section 23, which guarantees that "[n]o . . . law impairing the obligations of contracts shall ever be passed." The purpose of the contract clause is to lend certainty to the reliability of contractual pledges. Such certainty is essential to the ability of state and local governments to obtain credit through the capital markets. We find that section 6 reduced the Sound Transit bondholders' security. Accordingly, we hold that section 6 impermissibly impairs the contractual obligations between Sound Transit and the bondholders. Thus, I-776 has no legal effect of preventing Sound Transit from continuing to fulfill its contractual obligation to levy the MVET for so long as the bonds remain outstanding.

¶66 If we accepted the intervenors' invitation to fundamentally alter our contracts clause jurisprudence, we would imperil the ability of state and local governments to finance essential public works projects such as elementary schools, fire stations, highways, and bridges by casting considerable doubt on the reliability of pledged funding sources. We decline to do so.

¶67 We note, however, that nothing in our decision today forecloses Sound Transit from electing to retire the bonds early. We also note that this court lacks the authority to compel that result.

¶68 We affirm the trial court's summary judgment order in favor of Sound Transit and its final order on the refund of vehicle license fees.

ALEXANDER, C.J.; C. JOHNSON, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ.; and SCHULTHEIS, J. PRO TEM., concur.

¶69 SANDERS, J. (dissenting) — Central Puget Sound Regional Transit Authority (Sound Transit) argues article I, section 23 of the Washington Constitution obliges it to levy and collect $1.8 billion in unlawful motor vehicle excise tax for the life of its Series 1999 bonds. The majority agrees, but I cannot.

¶70 The real object of this suit is to enable Sound Transit to benefit from the collection of $1.8 billion in illegal taxes, not to protect the Series 1999 bondholders, who are not even a party. Sound Transit's total obligation to its Series 1999 bondholders of $738 million is well secured by $6.3 billion in lawful sales and use tax revenue. The contractual obligation to repay the bondholders is intact, even if Sound Transit's bottom line is not.

¶71 In 1999, Sound Transit issued $350 million in 30-year bonds (Series 1999 bonds) secured by its sales and use tax and motor vehicle excise tax (MVET) revenues. Sound Transit's total obligation to the Series 1999 bondholders is $738 million, including principal and interest. Over the life of the bonds, Sound Transit expects to collect about $6.3

billion in sales and use tax plus $1.8 billion in MVET. In 2002, Sound Transit collected about $207 million in sales and use tax and about $58 million in MVET. Of this $265 million in total tax revenues, Sound Transit used about $17 million to fund its Series 1999 bonds. On November 5, 2002, the people of Washington passed Initiative No. 776 (I-776), repealing Sound Transit's authority to levy MVET.

¶72 The majority concludes I-776 substantially impairs the Series 1999 bondholders' contract with Sound Transit in violation of article I, section 23 of the Washington Constitution because the contract obliges Sound Transit to levy MVET for the life of the bonds.[23] I disagree. A law impairs the obligation of a public contract in violation of article I, section 23 only if it impairs a valid contractual obligation to the prejudice of the contracting party. *See Retired Pub. Employees Council of Wash. v. Charles*, 148 Wn.2d 602, 624, 62 P.3d 470 (2003). I-776 doesn't affect a valid contractual obligation because Sound Transit lacked authority to pledge to continue to levy MVET notwithstanding its possible repeal. And nothing in the record suggests I-776 lowered the value of the Series 1999 bonds, which is the ultimate evidence a bond contract obligation has been impaired.

¶73 In any case, even if Sound Transit does have a valid contractual obligation to levy MVET and I-776 did lower the value of the Series 1999 bonds, the bondholders are entitled only to damages or just compensation. While the State may not impair the obligation of its contracts, like any private party, it may breach a contract and pay damages. *Hays v. Port of Seattle*, 251 U.S. 233, 238, 40 S. Ct. 125, 64 L. Ed. 243 (1920). Furthermore, contractual obligations are property subject to eminent domain. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 18-19, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977); *Tyrpak v. Daniels*, 124 Wn.2d 146, 155 n.1,

---

[23] As the majority concedes, article I, section 23 of the Washington Constitution is coextensive with the contracts clause of the United States Constitution. Majority at 27 n.5. Accordingly, opinions of the United States Supreme Court interpreting the contracts clause are binding on this court's interpretation of article I, section 23. *Tyrpak v. Daniels*, 124 Wn.2d 146, 151, 874 P.2d 1374 (1994).

874 P.2d 1374 (1994). If a remedy in damages is available, then I-776 is a breach of contract and the Series 1999 bondholders are entitled to damages. If no remedy in damages is available, then I-776 is a taking and the Series 1999 bondholders are entitled to just compensation. But nothing entitles the Series 1999 bondholders to specific performance.

## I. Sound Transit Lacked Authority To Pledge To Levy MVET Notwithstanding Its Repeal

¶74 I-776 does not violate article I, section 23 because Sound Transit lacked authority to pledge to levy MVET notwithstanding possible repeal. A law affecting a public contract violates article I, section 23 only if it impairs a valid contractual obligation. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 145, 744 P.2d 1032, 750 P.2d 254 (1987). The State authorized Sound Transit to levy MVET. Former RCW 81.104.160(1) (1998). And it authorized Sound Transit to pledge MVET revenues. RCW 81.104.180. But it did not authorize Sound Transit to pledge to levy MVET for all time notwithstanding repeal. Accordingly, Sound Transit's pledge to levy MVET in the future was ultra vires and invalid.

¶75 Of course, the legislature can authorize a public entity to pledge to levy a tax in the future. *Mun. of Metro. Seattle v. O'Brien*, 86 Wn.2d 339, 351, 544 P.2d 729 (1976); *see also U.S. Trust Co.*, 431 U.S. at 24 (holding "the State could bind itself in the future exercise of the taxing and spending powers"). However the power to tax "must be granted expressly," not by implication. *Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804, 809, 650 P.2d 193 (1982). "Before a statute—particularly one relating to taxation—should be held to be irrepealable, or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no room for doubt." *Covington v. Kentucky*, 173 U.S. 231, 239, 19 S. Ct. 383, 43 L. Ed. 679 (1899); *see also Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446, 17 L. Ed. 173 (1862) (holding

"neither the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken"); *City of Tacoma v. Tax Comm'n*, 177 Wash. 604, 612, 33 P.2d 899 (1934) ("Every presumption is in favor of the reservation by the state of the complete exercise of this fundamental right."). The power to tax is an essential element of sovereignty, and a delegation of sovereign authority is no casual matter.

¶76 On occasion we have concluded the legislature authorized a public entity to pledge to levy a tax in the future. For example, when former RCW 35.58.273 (1969) authorized certain municipalities to issue bonds secured by MVET revenues and former RCW 35.58.279 (1969) provided, " '[t]he legislature shall not withdraw from the municipality the authority to levy and collect the tax' " for the life of the bonds, the municipalities were authorized to pledge to levy MVET. *O'Brien*, 86 Wn.2d at 350, 344-45 (emphasis omitted) (quoting former RCW 35.58.279). But any delegation of taxing authority is strictly construed, *United States v. Winstar Corp.*, 518 U.S. 839, 875, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996), and "[n]othing can be taken against the State by presumption or inference." *Del. R.R. Tax*, 85 U.S. (18 Wall.) 206, 225, 21 L. Ed. 888 (1873); *see also City of Tacoma*, 177 Wash. at 612.

¶77 However nothing in RCW 81.104.180 expressly delegated Sound Transit authority to pledge to levy MVET in the future. On the contrary, it only authorized Sound Transit to pledge MVET "revenues," not to guarantee there would in fact *be* revenues. RCW 81.104.180. So, the legislature authorized Sound Transit to pledge any MVET revenues it collected so long as it retained authority to levy MVET. But it reserved the right to rescind Sound Transit's authority to collect MVET.

¶78 Accordingly, Sound Transit's pledge to levy MVET was ultra vires. And an ultra vires contract with a public entity "is void and unenforceable." *Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 499, 886 P.2d

147 (1994). The Series 1999 bondholders had " 'full knowledge of the fact that the Legislature could make the change and, in fact, the possibility of such a change was an incident of the contract since the applicable law became a part of it.' " *City of Tacoma*, 177 Wash. at 615 (quoting *State ex rel. City of Sedalia v. Weinrich*, 291 Mo. 461, 471, 236 S.W. 872 (1921)). They cannot now complain Sound Transit impaired a contractual obligation it lacked authority to assume.[24]

## II. I-776 Did Not "Impair" the Obligations of the Series 1999 Bonds

¶79 Similar to the United States Constitution,[25] the Washington Constitution provides, "No . . . law impairing the obligations of contracts shall ever be passed." CONST. art. I, § 23. As noted by the majority, however, "[i]t is well settled that these state and federal constitutional provisions are coextensive and are given the same effect." Majority at 27 n.5.

¶80 The "obligation" of the series 1999 bonds at issue in this proceeding is simply to repay principal and interest to the bondholders as promised. Therefore we must determine whether that obligation has been "impaired" in the constitutional sense.

¶81 In summary, I-776 did not "impair" the legal *duty* of Sound Transit to repay bondholders (as would be the necessary result if there were actually an impairment of their contractual obligation to repay principal and interest) and did not "impair" the *ability* of Sound Transit to repay its bondholders. Moreover a law affecting a public bond contract violates article I, section 23 only if it *substantially* impairs the bond's obligation to pay. *Tyrpak*, 124 Wn.2d at 152. However a law substantially impairs a bond obligation only if it lowers the value of the bond. *See, e.g., U.S. Trust Co.*, 431 U.S. at 18-19; *Charles*, 148 Wn.2d at 627. In other

---

[24] However, in certain circumstances a private party acting in good faith may be entitled to equitable relief. *Noel v. Cole*, 98 Wn.2d 375, 381, 655 P.2d 245 (1982).

[25] "No state shall . . . pass any . . . law impairing the obligation of contracts." U.S. CONST. art. I, § 10, cl. 1.

words, a party alleging an impairment of a bond contract must show "loss causation," i.e., a causal connection between passage of the law and an economic loss. *Cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005). But this record contains no evidence Series 1999 bondholders suffered any economic loss in the first place. After all, the "impairment" must be of the contract's "obligation" to the bondholders (i.e., repayment). And if the alteration in the contract's terms does not diminish the value of the contract by making payment less likely, there is simply no impairment of the obligation.

¶82 The absence of any evidence that the value of the bonds has diminished is easily understood on this record because there remains $6.3 billion in lawful sales and use tax to secure the obligation to Series 1999 bondholders of $738 million, and the repayment obligation of the bonds is fully insured to boot. There is simply no possibility these bonds will not be repaid absent MVET revenues. On this record these bonds may have *increased* in value since their issuance.

¶83 Nevertheless the majority insists a law substantially impairs a public contract in violation of article I, section 23 if it alters the contract's terms in any way. *See* majority at 30-36. The majority is mistaken. Indeed, a law affecting a public contract cannot "discard the legitimate expectations embodied in the contract" or "dramatically diminish the inducements which led to the initial formation of the contract." *Tyrpak*, 124 Wn.2d at 155 n.1. But "a contract with the government does not impose upon it a binding obligation to maintain with photographic precision the status quo at the time of the contract." *Id.* To the contrary, evaluation of a contract impairment claim requires a "particularized inquiry into the legitimate expectations of the contracting parties." *U.S. Trust Co.*, 431 U.S. at 19 n.17. And the legitimate expectation of this bondholding contracting party is that the obligation to repay that party be met. If the legislative change has not actually diminished the value of the bond, it has not "impaired" its "obligation."

¶84 Thus, article I, section 23 permits laws affecting public contracts. It prohibits only laws impairing their obligations by altering the contractually due performance of a contractual obligation to the prejudice of the contracting party. *See Charles*, 148 Wn.2d at 627 ("While Retirees and Employees maintain that they need not show a likelihood of harm, to allow them to claim that their contractual rights have been substantially impaired based on their assertions alone would open the door for any future plaintiff to bring a successful suit against the Director without *any* showing that harm is even *likely* to result.").

¶85 In the case of a publicly traded bond, the calculation is quite simple because the market price of a publicly traded bond precisely expresses its value.[26] A law "which diminishes the value of the contract constitutes a prohibited impairment." *O'Brien*, 86 Wn.2d at 352. So, if a law affecting the bond contract reduces the price of the bond, it impairs the bond contract, and if it does not reduce the price of the bond, it does not impair the bond contract.

¶86 However even then a party alleging a violation of article I, section 23 must demonstrate both economic loss and causation. Or rather, it is *necessary* but not *sufficient* to show a decrease in the value of the bond. A "mere change in the value or rating of the outstanding bonds, *by itself*, is not enough to prove an impairment of contract." *Tyrpak*, 124 Wn.2d at 153 (emphasis added). A party alleging an impairment of a bond contract must also show loss causation. No impairment exists unless the law caused the loss. In this

---

[26] The majority disagrees based upon language in cases such as *Caritas Services, Inc. v. Department of Social & Health Services*, 123 Wn.2d 391, 404, 869 P.2d 28 (1994), that "a contract is impaired by legislation which alters its terms, imposes new conditions, or lessens its value." Majority at 30. As a general proposition, I do not quarrel with this formulation as long as we understand (1) only harmful or detrimental alteration of terms and conditions of an obligation from one contractual party to another will suffice and (2) the materiality and harmfulness of the alteration, if any, will necessarily be reflected in the value of the bond because bonds are traded on the market. In nonbond situations (as *Caritas Services*), one looks to see if there is prejudice to the contracting party with the alteration of contractual terms. *Caritas Services* made out a prima facie case of contractual impairment by demonstrating a loss of approximately $175,000.

case however we need not consider causation because there is no predicate showing of value loss in the first place.

¶87 The majority, at 30, correctly recognizes a law affecting a municipal bond contract violates article I, section 23 if it "detrimentally affects the financial framework which induced the bondholders originally to purchase the bonds, without providing alternative or additional security." *Tyrpak*, 124 Wn.2d at 153-54. There the trial court specifically found the particular alteration of the financial framework actually diminished the value of the bonds. But curiously, the current majority insists a law can impair the obligation of a bond contract without lowering its value. This is unprecedented and illogical. I can find no Washington or United States Supreme Court case which has ever found an impairment of a bond contractual obligation absent a diminution in its value.

¶88 Contrary to the claim of the majority, *United States Trust Co.* does not serve as such an example. There the Supreme Court found relevant the parties' disagreement about the *value* of the 1962 covenant to bondholders. 431 U.S. at 18-19. After a trial on the question of whether the value had been diminished, the trial court made a factual finding that " 'immediately following repeal and for a number of months thereafter the market price for Port Authority bonds was adversely affected.' " *Id.* at 19 (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 134 N.J. Super. 124, 338 A.2d 833, 865 (1975), *aff'd*, 69 N.J. 253, 353 A.2d 514 (1976)). Respondents however countered, and the trial court factually found, "after an initial adverse effect they regained a comparable price position in the market." *Id.* The United States Supreme Court observed "[t]he fact . . . that no one can be sure precisely *how much* financial loss the bondholders suffered" did not matter because "the question of valuation need not be resolved in the instant case because the State has made no effort to compensate the bondholders for any loss sustained by the repeal." *Id.* (emphasis added). In other words, the Supreme Court understood the record to indicate there was some loss,

although it was not necessary for their impairment analysis to determine precisely how much. Here, however, we review cross motions for summary judgment where the intervenors presented evidence there was no impairment of value, whereas Sound Transit presented no contrary evidence that there was. Under our jurisprudence, as well as that of the Supreme Court, this is fatal to an impairment claim.[27]

¶89 In *Tyrpak*, for example, the trial court expressly found:

> "The value of outstanding [general obligation] bonds is reduced due to 1) the removal of part of the PORT OF VANCOUVER'S assessed territory by the proposed annexation, and 2) the uncertainty of further annexation in the future."

*Tyrpak*, 124 Wn.2d at 151 (quoting Clerk's Papers at 75). We further explained, "The court found that the reduction or threat of reduction in the assessed valuation adversely affected the credit rating and *value* of the outstanding bonds as well as future issues." *Id.* at 150 (emphasis added). We then cautioned even a diminution of contract value is insufficient, in itself, unless it is also proved the diminution was caused by the legislation at issue:

> A mere change in the value or rating of the outstanding bonds, by itself, is not enough to prove an impairment of contract.
>
> Rather, the relevant question is whether the legislation detrimentally affects the financial framework which induced the bondholders originally to purchase the bonds, without providing alternative or additional security. *See Haberman*, [109 Wn.2d] at 146-47; *Continental Ill. Nat'l Bank [& Trust Co. v. Washington]*, 696 F.2d [692,] 701 [(9th Cir. 1983)].

---

[27] I find it somewhat ironic that the majority at once admits the necessity to establish prejudice while eschewing any requirement that diminution in value be factually shown, asserting, "the dissent would substitute ad hoc judicial determinations of prejudice for the standards that have evolved over decades of case law." Majority at 34 n.8. Indeed it is the majority which would dispense with factual determinations of prejudice, instead substituting its own "ad hoc judicial determination of prejudice" by simply stating there had been a technical change in the contracted security meriting its own "ad hoc judicial" assumption that therefore there must be harm to the bondholders. But that fact needs to be proved, not just assumed, to sustain an impairment claim.

*Tyrpak*, 124 Wn.2d at 153-54. Notwithstanding the majority's evident confusion occasioned by reading the quoted text out of context, *Tyrpak* means what we have always said about bonds: a bond obligation is impaired where legislation diminishes the value of the bond by *detrimentally* affecting the financial framework inducing the purchase of the bonds.[28] A change in the financial framework which is not detrimental to performance of the obligation as reflected in the bond's value is not an impairment of that obligation. But contrary to every bond impairment case we have ever decided, the majority claims a bond obligation may be impaired without lowering the value of the bond.

¶90 An efficient market, like the market for publicly traded bonds, necessarily incorporates any contractual impairment into the price of a bond. So, if a law does not affect the price of a bond, it obviously did not impair the obligation of the bond.

¶91 Allowing bondholders "to claim that their contractual rights have been substantially impaired based on their assertions alone would open the door for any future plaintiff to bring a successful suit . . . without any showing that harm is even likely to result." *Charles*, 148 Wn.2d at 627 (emphasis omitted). A law affecting the security of a bond may well impair the obligation of the bond contract. But that is a question of fact. If there is no proof that the value of the bond is lower, there is no proof of impairment.

---

[28] *Haberman*, relied upon by *Tyrpak*, expressly rejected a contract impairment claim because there was no proof that the legislative change at issue "diminished the value of their bonds, thus unconstitutionally impairing the force of their contracts." *Haberman*, 109 Wn.2d at 146. *O'Brien*, relied upon by *Haberman* as well as the majority, found a contract impairment was caused by the refusal of the state treasurer to remit to petitioner certain tax proceeds based upon a stipulation "that the bonds will be diminished in value from $30 to $60 per thousand dollars par value." *O'Brien*, 86 Wn.2d at 352. *Ruano v. Spellman*, 81 Wn.2d 820, 828, 505 P.2d 447 (1973), relied upon by *O'Brien*, held legislative action "though indirect, which diminishes the value of the contract constitutes a prohibited impairment is an established rule." *Ruano* further held "that the submission of that initiative constitutes an impairment of contract due to the encroachment upon the pledged proceeds of the special excise tax and the *consequent diminution of value of the stadium bonds*—a diminution established by the findings of the trial court, based upon substantial evidence." *Id.* (emphasis added). *Continental Illinois*, 696 F.2d at 698, found a contractual impairment because "[Bonneville Power Administration's] sole benefit . . . is rendered valueless . . . ."

III. The Series 1999 Bondholders Are Not Entitled to Specific Performance

¶92 Even if Sound Transit did have authority to pledge to levy MVET and I-776 did lower the value of the Series 1999 bonds, the Series 1999 bondholders are entitled only to damages or just compensation, not specific performance. Article I, section 23 prohibits the State from impairing the obligation of a public contract. But it does not prohibit the State from breaching a public contract and paying damages, just like any private party. *See, e.g., Hays*, 251 U.S. at 238; *St. Paul Gas Light Co. v. St. Paul*, 181 U.S. 142, 151, 21 S. Ct. 575, 45 L. Ed. 788 (1901). Nor does it prohibit the State from exercising its power of eminent domain and paying just compensation. *See, e.g., U.S. Trust Co.*, 431 U.S. at 18-19; *Tyrpak*, 124 Wn.2d at 155 n.1. In any case, the bondholders are entitled to the value of their contract, no more.

¶93 Apparently, the majority believes article I, section 23 prohibits the State from breaching public contracts. The majority is mistaken. "For when a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contract; it is committing a breach of contract." *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) (Posner, C.J.). A contract is merely a form of property, its value consisting in its obligation. "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 462 (1897). When the State forms a contract, it must perform or pay damages, just like any private party. Article I, section 23 prohibits the state from voiding public contracts absent a police power justification. *See Stone v. Mississippi*, 101 U.S. (11 Otto) 814, 817, 25 L. Ed. 1079 (1880) (holding that "the legislature cannot bargain away the police power of a State"). That is all.

¶94 A law affecting a public contract is a breach of contract if it provides a remedy in damages and an impair-

ment of contract if it does not. *See Hays*, 251 U.S. at 237 (distinguishing "between a statute that has effect of violating or repudiating a contract previously made by the State and one that impairs its obligation"); *see also E&E Hauling, Inc. v. Forest Pres. Dist. of Du Page County*, 613 F.2d 675, 679 (7th Cir. 1980) ("If the action of the state does not preclude a damage remedy . . . there has been no law impairing the obligation of the contract."). Essentially, "legislation impairs a public contract only if it prevents or materially limits the remedies that would be available if the contract were between private parties." Leo Clarke, *The Contract Clause: A Basis for Limited Judicial Review of State Economic Regulation*, 39 U. Miami L. Rev. 183, 234 (1985). And the remedy for breach of contract is damages.

¶95 Even if I-776 prevented Sound Transit from performing its contract with the Series 1999 bondholders (which it clearly does not), it does not preclude a damage remedy. And so long as a damage remedy exists, the contract is unimpaired. "In short," the majority has "confused impairment of performance of a contract with impairment of the obligation of the contract." *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 312 (8th Cir. 1978). If Sound Transit is contractually obliged to levy MVET, an initiative such as I-776 is merely one way the State can breach its contract. *See Horwitz-Matthews*, 78 F.3d at 1251. The Series 1999 bondholders are perfectly entitled to bring an action for breach of contract against Sound Transit.[29] But they cannot insist it perform.

¶96 Furthermore, article I, section 23 doesn't prohibit the State from exercising its power of eminent domain. *See, e.g., U.S. Trust Co.*, 431 U.S. at 18-19; *Tyrpak*, 124 Wn.2d at 155 n.1. So, even if I-776 does preclude a damage remedy, it merely obliges the State to provide just compensation. The State cannot nullify its contractual obligations. But it is never obliged to provide specific performance.

---

[29] Of course, I doubt the Series 1999 bondholders could prove any damages, as Sound Transit's total obligation of $738 million of its Series 1999 bonds is not only fully secured by $6.3 billion in sales and use tax revenue but also fully insured. See Bond Purchase Contract at 4 and 13.

## IV. Conclusion

¶97 In principle, I admire the Lochnerian rigor with which the majority defends the sanctity of contractual obligation. *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905). Unfortunately, its proposed remedy finds no support in the law. In contracts, as in love, "you can't always get what you want," but the law of remedies ensures "you get what you need."[30] Only the Series 1999 bondholders possess a legally enforceable right protected by article I, section 23. *See Moses Lake Sch. Dist. No. 161 v. Big Bend Cmty. Coll.*, 81 Wn.2d 551, 558, 503 P.2d 86 (1972). Indeed, they expected Sound Transit to collect MVET for the life of their bonds. But it appears Sound Transit's pledge to levy MVET was invalid, and there is no evidence its incapacity to collect MVET substantially impairs the Series 1999 bonds. And in any case, the Series 1999 bondholders are entitled only to damages or just compensation, which cannot exceed the value of their bonds. They simply cannot oblige Sound Transit to collect $1.8 billion in illegal MVET over the course of decades to satisfy a $738 million obligation already secured by $6.3 billion is sales and use tax revenue.

¶98 Of course, as a public entity unprotected by article I, section 23, Sound Transit considers I-776 an unfortunate intrusion into its affairs. It contemplates contracts I-776 may render impossible to fund. But it cannot object. The State entrusted Sound Transit with certain powers and properties, and "may, at its pleasure, modify or withdraw such powers, may take without compensation such property, hold it itself, or vest it in other agencies." *Moses Lake Sch. Dist.*, 81 Wn.2d at 557. For better or worse, I-776 withdraws a power previously granted.

¶99 Article I, section 23 prohibits the State from impairing its contractual obligations. But it does not bind the

---

[30] THE ROLLING STONES, *You Can't Always Get What You Want*, on LET IT BLEED (ABKCO 1969); *cf.* Gretchen Craft Rubin & Jamie G. Heller, *Restatement of Love*, 104 YALE L.J. 707, 727 n.47 (1994) ("Specific performance, of course, is not an available remedy in this situation.").

State to specific performance. The constitution is a compact, not a straitjacket. What the State has done, it may undo. Article I, section 23 only obliges it to make good on its responsibilities.

¶100 I dissent.